Filed 10/9/20  Cal. Casualty Indemnity Exchange v. Downs CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| CALIFORNIA CASUALTY INDEMNITY EXCHANGE, | C078460 |
| Plaintiff and Appellant, | (Super. Ct. No. CV031407 ) |
| v. | |
| BEVERLY DOWNS, | |
| Defendant and Respondent. | |

Defendant Beverly Downs, a resident of Lodi, had an automobile insurance policy with plaintiff California Casualty Indemnity Exchange (CCIE).  She added her son, Justin Travnicek, and his Volvo to the policy based on her representations to CCIE agents that Travnicek was a member of her household and was a college student living away from home.  Rita Rios, one of the CCIE customer service representatives with whom Downs spoke, did not believe Downs's representations.  Rios was right in her assessment that Downs was lying.  Travnicek was neither a household member nor a college student;

1

rather he was in the Marine Corps stationed at Camp Pendleton and he resided in Oceanside. Consequently, he did not qualify to be added to Downs's CCIE policy with its discounted premiums.

Two months after Downs added him to the policy, Travnicek and his passenger Douglas Hunter were killed in a two-car vehicle accident. CCIE acceded to the demand of Douglas Hunter's widow for payment of the $500,000 policy limit. CCIE then sued Downs to rescind the policy on the grounds that Downs obtained coverage for Travnicek through material misrepresentations. CCIE also sued for fraud, seeking damages for the money it paid to Hunter's widow.

The trial court bifurcated the issues related to rescission to be litigated at a bench trial. The court concluded that Downs had intentionally misled two customer service representatives to obtain lower premiums on Travnicek's coverage. However, the court further concluded that, under *Barrera v. State Farm Mut. Auto. Ins. Co.* (1969) 71 Cal.2d 659 (*Barrera*), "[a]ny right [CCIE] had to rescind the . . . policy covering [Travnicek] and his Volvo was lost by [CCIE's] failure to exercise due diligence in determining whether Rios'[s] belief that [Downs] was lying was correct." Based on that, the trial court found that CCIE was estopped from bringing an action for rescission and found for Downs on CCIE's remaining causes of action. After the trial court granted CCIE's motion to compel arbitration on Downs's claims in her cross-complaint, the arbitrator awarded Downs $50,000.[1]

CCIE appeals from the final judgment of the trial court which, consistent with the statement of decision and the arbitrator's award, was in favor of Downs. CCIE asserts on appeal that (1) the trial court misinterpreted *Barrera*, (2) CCIE's interpretation of *Barrera* is consistent with Insurance Code provisions on which it relies regarding

---

[1] As Downs notes, the proceedings in this case carried on for 10 years before briefing in this appeal.

misrepresentation and concealment, (3) Rios's mere "suspicions" concerning Downs's statements did not obligate CCIE to investigate, (4) there was no substantial evidence of any reasonable investigation which would have exposed Downs's misrepresentations, (5) the judgment cannot be affirmed based on implied findings because CCIE filed objections to the statement of decision, and (6) this court need not remand for further findings because there is no dispute as to the amount of damages, and so we should enter judgment in CCIE's favor in the amount of $500,000.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND
### Pre-trial Proceedings

CCIE commenced this action against Downs and her former husband,[2] asserting 12 causes of action in the operative second amended complaint. In the first cause of action CCIE sought rescission of the policy for fraudulent misrepresentation, and in the second cause of action, CCIE sought rescission of the policy for material misrepresentation of material facts. In the twelfth cause of action, CCIE alleged fraud and sought damages related to the payment it made to Hunter's widow and costs related to that litigation.[3]

---

[2] Downs's former husband is no longer a party to the action. Any references to him have been omitted, and the facts have been presented to describe Downs as the only defendant.

Downs was originally sued under her married name, Ives. She now appears, and we refer to her throughout this opinion, using her maiden name.

[3] In addition to these three causes of action, the second amended complaint alleged the following causes of action: (3) mistake; (4) concealment; (5) breach of the duty to cooperate; (6) breach of the duty of good faith and fair dealing; (7) reformation; (8) voidness for lack of insurable interest; (9) estoppel; (10) breach of Insurance Code section 556; and (11) declaratory relief. Each cause of action asserted that the policy was void because of Downs's misrepresentations, that the policy was rescinded or requested a court order or judgment rescinding the policy, or incorporated the voidness allegation and

3

Downs filed a cross-complaint for breach of contract, declaratory relief, and specific performance, seeking, among other things, a judgment declaring Travnicek and his vehicle were covered under Downs's policy with CCIE, and $485,000 for the loss associated with Travnicek's death.[4]

Prior to the trial, CCIE moved to have the case tried without a jury, arguing that the case involved "a rescission action, an action in equity."  Counsel for CCIE explained: "[a]s an insurance company, we are seeking to rescind from our policy letter coverage . . . .  We do so on the grounds that the number of theories, misrepresentation being the essence of it and concealment . . . ."  CCIE's counsel further indicated that he agreed with Downs's motion to bifurcate the equitable issues for bench trial.  He specifically agreed with counsel for Downs that the rescission issue should be decided first "because it will decide *all* the other issues in the case . . . ."  (Italics added.)

The trial court expressed its understanding that all of CCIE's causes of action were premised on rescission.  The court stated:  "[W]hen you look at rescission, all the causes of action underneath are just reiterating different reasons for the rescission.  They're not really separate and independent causes of action, something different and new."  Referencing the arguments of both counsel, the court stated, "we agree that rescission is the focal point of the complaint filed initially."  In a written ruling, the court stated that "[CCIE's] causes of action are based upon rescission, and those causes of action will be

the rescission request by reference from preceding causes of actions  The fourth, fifth, sixth, and seventh causes of action requested that the policy be reformed to exclude coverage related to Travnicek and his vehicle or declaring that there was no such coverage.  The seventh, eighth, ninth, and tenth causes of action requested a declaration that there was no coverage for the accident for claims by Hunter's widow or Downs.  The eleventh cause of action sought a declaration that CCIE had no duty to defend or indemnify.

[4]  This amount represents $500,000, the CCIE policy limit, less the $15,000 per person coverage under the insurance policy of the other driver involved in the accident.

4

heard first in a non-jury trial. The remaining causes of action in [Downs's] cross-complaint will be heard subsequent to the trial on the rescission issues." The record reflects no objection to the court's pretrial ruling indicating that *all* of CCIE's causes of action were based on rescission or that *all* of CCIE's causes of action would be tried in the initial phase of the bifurcated trial.

**Trial Evidence Presented by CCIE**

**CCIE's Business Model and Rates**

Charles Muenzen, vice president of underwriting and product development for CCIE, testified that CCIE marketed its insurance to particular group members, including members of the California Teachers Association. CCIE determined that certain occupations have better-than-average loss results, so CCIE marketed to those occupations, allowing it to charge lower premiums to policyholders in those occupations. A member of a household added to a policy will receive the policyholder's discount. People who are not members of the targeted groups, and are not members of a policyholder's household, may be offered a policy as a nonmember. However, the member rate is approximately 43 percent lower than the nonmember rate.

A child of a member who is either living at the home of the parent member or a full-time student away at college is eligible to be added to a parent's policy as a member of the household at the member rate. A child who leaves the household is eligible for a CCIE policy only at the higher nonmember rate. People in the military must obtain a separate policy; CCIE had "no special military residents procedure."

**Travnicek's Residence**

Travnicek and Douglas Hunter were both full-time active-duty members of the Marine Corps, and best friends. Travnicek was stationed at Camp Pendleton. Hunter's widow testified that Travnicek lived with her and her husband in an apartment in Oceanside in Southern California. They all moved into that apartment in September

5

2005. The Hunters and Travnicek all signed the lease. Travnicek lived at that apartment until the time of the accident.

**Downs's Phone Conversations with CCIE Representatives**

CCIE customer service representative Rita Rios testified that when a customer call is received, it is routed to the first representative available in the Colorado Springs, Kansas, or Arizona offices. She explained that, when a customer calls, the customer service representative has computer access to the customer's entire file. In addition to information such as members of the household and vehicles on the policy, there is a field for "policy comments," which is for the customer service representative's documentation of "the gist of what [is] reviewed with the customer and what transpire[s] in the telephone call." These notes are made as the customer service representative speaks to the customer. They are a "permanent record" so other customer service representatives can see what happened on previous calls. Rios testified about various notes made in the policy comments related to Downs's policy.

On August 9, 2002, three years before the accident, Downs called to advise that Travnicek was in the Marines. As a result, he was deleted from the household and thus no longer covered on the policy. Deductions for his coverage were no longer made from Downs's checking account.

On August 2, 2003, CCIE received a call from someone who worked at Enterprise car rental seeking to determine if Travnicek was covered, but no information was provided. Travnicek then called, indicating he needed a policy. He was referred to the sales department. Travnicek called again to inquire if he could be added to Downs's policy if he moved back to the household. He was told Downs would have to call. Later on the same day, Downs called to authorize the addition of Travnicek to the policy, saying he was now living in the household. However, she did not have Travnicek's driver's license number, and she stated that she or Travnicek would call back. Later,

6

Travnicek called to be added to the policy.  He was added, and the Enterprise agent at the counter where Travnicek was renting a vehicle was advised of the coverage.

On August 11, 2003, Downs called back to delete collision coverage for Travnicek because the premium was too high.  At that time, she said Travnicek was in the military.  But she also said she claimed him as a dependent on her taxes and that he was going to school for one year.  A renewal comment was added to later verify that he was still going to school.

On July 22, 2004, Downs called to inform CCIE that Travnicek was no longer a dependent, no longer going to school, and that he was in the military in Iraq.  He no longer qualified to be in the household and was taken off the policy.

On May 3, 2005, seven months before the accident, Downs called CCIE and spoke with customer service representative Lori Smith.  A recording of the conversation was played at trial.[5]  Downs indicated at the outset that she lived in Lodi.  She told Smith she wanted "to know how much it would cost to put our son back on our policy, uh Justin, Travnicek, he's been on before."  After discussing which vehicle he was most likely to drive, running a DMV report, the annual mileage he was expected to drive, and policy premiums, the conversation continued:

"[SMITH]:  Okay - is he back home from the Army yet?

"[DOWNS]:  Well he's back in the states.

"[SMITH]:  Uh-huh.

---

[5] The written transcripts of the telephone conversations do not always accurately reflect our understanding of what was said in the recordings.  We have set forth the conversations as we hear them on the recordings rather than how they appear in the transcripts.

7

"[DOWNS]: Yeah not right at our place yet, so we're just looking at all the coverages so." Downs indicated that she intended to "get back to him and see what he wants to do."

Asked if it was common practice to give a quote where the person to be added is not a member of the household, Rios testified, "We'll give a quote based on if we think he's going to be coming back into the household."

On September 20, 2005, Downs spoke over the phone to Mary Watkin, another CCIE customer service representative. The recorded conversation was played at trial. In the conversation, Downs asked if Travnicek needed to be a full-time or part-time student to insure him under her policy. Watkin told Downs it did not matter whether he was a full- or part-time student as long as he lived in her home. Watkin asked Downs if Travnicek was a member of the household and Downs replied, "yes." Downs did not tell Watkin that Travnicek was a Marine stationed at Camp Pendleton living in Southern California.

On September 26, 2005, a little more than two months before the accident, Downs called CCIE again about adding Travnicek and his Volvo to Downs's policy. This time she spoke with Rios. During the conversation, Downs verified that she still resided in Lodi, California. A recording of this conversation was played for the court.

"[DOWNS]: Uh, yes I need to find out a price or a quote on adding my son to a policy.

[¶] . . . [¶]

"[RIOS]: Okay. And your son who are we adding?

"[DOWNS]: Um, well I don't know if I want to add him yet or not but I want to find out the price of adding him and his car. Um. It's Justin Travnicek he's been on before.

"[RIOS]: Is he in the household?

8

"[DOWNS]: Yes he is um he's currently at coll - you know taking a class at college or taking classes but yes when, you know, during breaks and things yeah he's home.

"[RIOS]: Okay. Is he insured anywhere else?

"[DOWNS]: Yes he is. At the moment he is insured um I'm trying to think it's Geico or something else but I he [sic] just got a car like a month ago and he insured it with a different company at the moment but it's really high and I'm thinking well let me at least check our prices and see how it goes, so.

"[RIOS]: Okay. What kind of vehicle did he purchase?

"[DOWNS]: He has a Volvo four-door sedan S40.

"[RIOS]: And the year?

"[DOWNS]: 2002.

"[RIOS]: And for coverage what were you looking for on it?

"[DOWNS]: Um real high deductible and minimal cov…, you know we'd like to save as much as we can on the premiums.

"[RIOS]: Okay well he would, if he gets added to your policy it will be with the same limits of liability that you have on your policy . . . .

"[DOWNS]: Yeah I realize no that's gonna put it high but that is.

"[RIOS]: Does he have a lien holder?

"[DOWNS]: No he doesn't.

"[RIOS]: Okay. Um the highest deductible we have is a thousand.

"[DOWNS]: Okay. That's fine.

"[RIOS]: Okay. And would he use it to get to and from work or anything?

"[DOWNS]: Um, yeah that would be probably the only way do it.

"[RIOS]: Okay.

"[DOWNS]: He basically has public transportation he tries to do to save money on the gas so I'm not even sure if it's to and from to work but it's gonna be the minimum mileage.

"[RIOS]: How far is it one way to work for him?

"[DOWNS]: About two miles (laughter). He's, he's right around the corner, he, he lives in a dorm. Yeah. I mean. He doesn't even need it to get there so.

"[RIOS]: And about how many miles a year to do you think he would put on it?

"[DOWNS]: Probably three to five maybe . . . three to five thousand . . . I mean he's not gonna do much more than three probably. He's real tight, gets rides (laughter).

"[RIOS]: Okay it will take me just a couple of minutes here.

"[DOWNS]: Okay.

"[RIOS]: And the vehicle is it solely registered to your son?

"[DOWNS]: Yes.

"[RIOS]: And then do we have your permission to order his motor vehicles report? Um we have to order it through ah what we [sic] a company called Choice Point.

"[DOWNS]: That's fine. I know he has one ticket. If that helps you just, in an estimate, I, I know he has one ticket.

[¶] . . . [¶]

"[RIOS]: And you said currently he's with Geico?

"[DOWNS]: Uh I believe so. I could be wrong on what insurance he has now but I mean it's current and everything else but we're just kinda shopping at this point.

"[RIOS]: Mm-kay.

"[DOWNS]: Oh, in fact, is he still on the policy because I was just looking at a thing that we got sent out. He might be still on our policy.

"[RIOS]: He's listed there and they were questioning whether or not he was back from Iraq. Was he in the military, or.

"[DOWNS]: Yeah. Yeah, he's back.

"[RIOS]: Okay.

"[DOWNS]: And now he's taking classes and things and we're sending, we're paying for it.

[¶] . . . [¶]

"[RIOS]: And is he, he's back in school then?

"[DOWNS]: Yeah.

"[RIOS]: Do you know whether or not he has a 3.0 grade point average?

"[DOWNS]: Uh. Well he just started I don't think he's got grades yet.

"[RIOS]: Oh. Okay.

"[DOWNS]: But he tends to keep that when he's taken college before he had a 3.0. I would think he would qualify especially he's a little more mature than he was so I'm hoping he will. And he's taking courses he likes (laughter) rather than just the other stuff.

"[RIOS]: Uh-huh. And he's a full time student?

"[DOWNS]: Um at this point I don't know if he is you know he was trying for it but he didn't get all of the classes so he is sitting in on some, so I, I believe he will be.

"[RIOS]: Mm-kay.

"[DOWNS]: You know, they're still waiting to see if everyone shows up, but, so on.

"[RIOS]: Uh-huh, mm-kay. So basically from what I quoting it with right now is just what we know he has which is the driver's training uh discount because he got licensed at age 16.

"[DOWNS]: Oh yeah. He's had that that's no problem.

"[RIOS]: And then you know after the first semester if he has a 3.0, uh, grade point average and he is considered a full-time student just send in a copy of the transcript . . . .

"[DOWNS]: Okay.

11

"[RIOS]: So that we can give him the, the student rate.

"[DOWNS]: Now is my other, is my daughter, well, once we get done with this, my daughter Nicole I'm hoping she got a discount too because she is a full-time student and gets actually a 4.0 average so I want to make sure she's getting that discount too.

"[RIOS]: I'll check.

"[DOWNS]: She drives a Saturn, yeah, once we're done with this. . . . And to what age, do you go up to, like, age 25 if I'm supporting them in school or is there an age limit?

"[RIOS]: Um I want to say it's until 25, right.

"[DOWNS]: Okay.

"[RIOS]: For the good student you mean?

"[DOWNS]: Well for, yeah for student for anybody I'm supporting, any of my kids I'm supporting. I have a daughter that's 25 that's now wanting to go back to school but that's why I'm asking. But she's already 25 so I wasn't sure if I could put her on or if that's gonna do a difference.

"[RIOS]: If she lives with you, you can, as long as they live with you they can be on your policy. If they don't live with you then they have to get their own policy.

"[DOWNS]: Okay no she's not living with us.

"[RIOS]: Mm-kay. $1,098 a year with a $1,000 deductible. That's on a 2002 Volvo.

"[DOWNS]: Okay $1,098 a year. Okay. Let's go ahead and add him.

"[RIOS]: Are you also adding in his vehicle, or?

"[DOWNS]: Yeah.

"[RIOS]: Do you have the VIN number and everything?

"[DOWNS]: Uh no, you know, all I had was, I don't have that.

"[RIOS]: Mm-kay well that, we do, that's the most important thing we need to add him (laughter)if you want to call us back with that?

12

"[DOWNS]: Yeah let me, um, go ahead and kinda temporary add him or put everything in and I will call you right back.

"[RIOS]: Okay that sounds good.

"[DOWNS]: Let me get a hold of him.

"[RIOS]: Okay well *I'll just note the policy that he's back in the household that he's okay to be added*, he just has the uh one moving, and you're right he just had the one moving violation.

"[DOWNS]: Yeah no I knew he had that so okay and you need the VIN number . . . do you need anything else on the car?

"[RIOS]: Um no, that should do it.

"[DOWNS]: You have his driver's license and all that stuff?

"[RIOS]: Right. Mm-hmm.

"[DOWNS]: Okay, I will call you right back.

"[RIOS]: Okay sounds good. Anything else I can answer for you?

"[DOWNS]: No this looks good." (Italics added.)

According to Rios, when Downs called, Travnicek was listed on the policy, "but he was not being rated for," meaning CCIE was not charging a premium for him, and he was not insured under the policy. Rios testified that, to be covered under the policy, Travnicek would have to be an immediate family member such as a child living in the household. A child away at college full-time would qualify.

Discussing the policy comment she wrote summarizing the call, Rios testified that her purpose in entering the data into the policy comment was to inform the next customer service representative that she had ordered the motor vehicle report and loss history report and that Travnicek "was living back at home or in college, therefore eligible to be on the policy." When asked, "So you're basically telling the next person that you've already done the questioning and determined that he's back in the household, notifying that person of that fact?" She responded, "Correct."

13

Rios testified that she understood Downs's description of Travnicek as "back home" to mean that he was living with Downs. Downs also told Rios that Travnicek had enrolled in college. Rios was under the impression that Travnicek lived in Downs's house in Lodi and was a full-time college student. When Downs told her Travnicek was living in a dorm, she understood that to mean he was not living at home, but rather was living on campus, in a dorm room.

On cross-examination by counsel for Downs, Rios was asked, "I guess what I'm confused about is did you think [Travnicek] was living at his mother's house in Lodi or in a dorm?" Rios testified, "To be honest with you, I was given different interpretations on the same conversation. One minute he was at home. The next minute he was at the dorm. The next minute he was at the dorm and walking to school . . . . So it was hard to determine on that conversation as to where he was really living other than when I asked if he was in the military, she said no, he's home." Asked whether she believed Downs was telling her that Travnicek was in Downs's household at the time of this telephone conversation, Rios testified that there was no doubt in her mind "that's what [Downs] was telling" her. Later, Rios testified that, based on the conversation, she was not sure where Travnicek was actually living. Rios never asked where Travnicek was going to school. However, Rios did ask whether Travnicek was still in the military or back home. Rios testified that she interpreted Downs's responses to questions about whether Travnicek had returned from Iraq to mean that he was no longer in the military. She further testified that Downs did not tell her that Travnicek was living in Oceanside, that he rented an apartment with the Hunters, or that he was an active-duty Marine.

Rios characterized Downs's responses to her questions as "evasive." Asked whether she believed Downs was lying to her during the conversation, Rios testified that she did. On cross-examination, she testified she thought Downs was lying "[m]ainly on the fact about whether or not [Travnicek] was a student or a member of her household or just where he is." However, Rios testified that she did not tell anyone about her belief

14

that Downs was lying. On redirect, Rios testified that she was not sure which was true, that Travnicek was living in Downs's Lodi house, or that he was living in a dorm at college. However, she testified that she believed one or the other was the truth and either would have qualified Travnicek for the policy.

Asked whether there was any way for Rios to verify the accuracy of information a policyholder such as Downs conveyed, Rios testified, "[f]or the most part, we take the insured's word." CCIE company policy was to accept insureds' representations as truthful. As for verifying an insured's representations, Rios testified that there was "nothing else available to us other than what the insured is telling us."

Rios testified that, when adding or restoring a driver to a policy, insurance companies will order, among other things, DMV reports. But the DMV reports they receive do not list the driver's address.

Reviewing a Geico document shown to her by counsel for CCIE, Rios testified that the document set forth an Oceanside address for Travnicek. That policy was issued August 17, 2005, and the policy period was August 18, 2005, through February 18, 2006. The policy indicated that the insured vehicle would be regularly garaged in Oceanside. Rios testified that Downs never told her that Travnicek lived at the Oceanside address.

On September 28, 2005, two days after speaking with Rios, Downs called CCIE to provide the Volvo's VIN and this time she spoke with Smith. A recording of the conversation was played at trial.

"[DOWNS]: Um I called the other day to add my son's car under our policy and I believe he is already on the policy.

"[SMITH]: Um.

"[DOWNS]: Justin Travnicek.

"[SMITH]: Uh huh.

15

"[DOWNS]: Okay he's already on. I didn't have his VIN number so I'm calling in to add his Volvo and I got a price of $1000 I don't know 97 something like that um on the price per year.

"[SMITH]: Okay. So we worked up a quote for you?

"[DOWNS]: You worked up a quote um I don't have it written down so once I give you all this you can (laughter) do it again.

"[SMITH]: Uh huh . . . yeah I can . . . .

"[DOWNS]: Let me give you the VIN number.

[¶] . . . [¶]

"[SMITH]: Who's the registered owner on the vehicle?

"[DOWNS]: Justin.

"[SMITH]: Justin is! Okay. I don't have a quote on that Volvo but I can submit it quickly.

"[DOWNS]: Okay that's fine.

[¶] . . . [¶]

"[DOWNS]: He has it currently insured but it's through a different company and I just want to put it on ours.

"[SMITH]: Do you just want to do that effective today?

"[DOWNS]: Um yeah that would be fine that's what I'm calling.

"[SMITH]: Okay. All right can I have you hold for just a few minutes while I get that worked up?

"[DOWNS]: Yeah.

"[SMITH]: Um before I do that, how far will he drive um going back and forth to work or school?

"[DOWNS]: (Inaudible)

"[SMITH]: So does he walk to school?

"[DOWNS]: Yeah . . . there's no parking.

"[SMITH]: The grocery . . . store.

"[DOWNS]: The minimal amount per year.

"[SMITH]: Okay. Like 5,000 per year.

"[DOWNS]: Yeah. That would be enough.

"[SMITH]: Alright . . . well if you could hold I will get something worked up for you.

"[DOWNS]: Okay and they did the um you know all the, the extra stuff.

"[SMITH]: Did he receive the letter?

"[DOWNS]: Oh, yeah.

"[SMITH]: You will want to send in a copy of his grades.

"[DOWNS]: Well he just started so I'm not going to have that for a while.

"[SMITH]: We will take the last semester.

"[DOWNS]: Well no, he wasn't in last semester.

"[SMITH]: Oh okay.

"[DOWNS]: So that doesn't . . .

"[SMITH]: Doesn't apply!

"[DOWNS]: Yeah. So I don't know how to I can do you know a couple of years back but I mean he's been that kind of student so I don't know . . .

"[SMITH]: When was the last time he was a full time student?

"[DOWNS]: In . . . about three years.

"[SMITH]: Yeah. We need to have you send in with his good grades and then we will apply that. Once we receive that.

"[DOWNS]: Okay. As long as he . . .

"[SMITH]: Well . . .

"[DOWNS]: Cause there is no way . . . how could you do that until it's over and that's four months down the road.

"[SMITH]: Does he get a mid term grade?

17

"[DOWNS]: They don't usually . . . they just get one grade for the class at the end. I mean the teacher runs the grade book.

"[SMITH]: Uh huh.

"[DOWNS]: That doesn't hand out you know they don't log them in to assist them or anything they're not handing out those. It's college.

"[SMITH]: Uh huh. Well I mean if it's been three years since he's been a full time student we can't I mean to show proof on him that's just far for us to go back we could go back to last semester or something like that. But um some school do [*sic*] post mid term grades but um you know we will just have to wait till he has something on that.

"[DOWNS]: Okay.

"[SMITH]: And you want like the 100 comprehensive 250 collision deductible?

"[DOWNS]: $1000.

"[SMITH]: Do you want a $1000 on both?

"[DOWNS]: Yeah I want a high deductible on it.

[¶] . . . [¶]

"[SMITH]: I came up with $1,110 which looks like it's just a $12 difference from what we had the other day which could be based on the vehicle.

"[DOWNS]: Okay . . .

"[SMITH]: Yeah . . . cause I put the VIN number in there . . .

"[DOWNS]: Okay and that's per year?

"[SMITH]: Yeah that's per year. And then let me check your billing.

[¶] . . . [¶]

"[SMITH]: So you want me to add your son's vehicle effective today?

"[DOWNS]: Yeah.

[¶] . . . [¶]

18

"[SMITH]: So when you get your confirmation you're actually going to get what looks like a duplicate because we've already processed your renewal so we want to add them on the existing policy and then to the renewal policy.

"[DOWNS]: Okay.

"[SMITH]: And then I did, um, I was able to match up on that $1098 on the Volvo what it is, is the difference for the year. Um so it looks like what's happening on that is that you're getting more of a discount because you had another anniversary with us. That would be the difference on that premium that's what I came in at $12 difference on that?

"[DOWNS]: Yeah.

"[SMITH]: Cause when I came into the year we matched up.

"[DOWNS]: Oh. Okay.

"[SMITH]: So I'll add those to that. And then does your son have any financing on the Volvo?

"[DOWNS]: No."

Smith added Travnicek to the policy during this conversation. Smith testified that, during this conversation, she reviewed the policy comments prepared by Rios on September 26, 2005. Rios's comments indicated that she had already spoken with Downs and that Travnicek was back in the household so CCIE could add Travnicek and his Volvo to the policy. Smith understood Travnicek's status as back in the household as meaning that he lived at Downs's home. Smith testified that, during the call, she did not ask Downs any questions about Travnicek living in the household, and that she relied solely on the policy comment prepared by Rios as establishing Travnicek's living situation.

Smith testified that Downs did not tell her that Travnicek was an active-duty Marine living in Oceanside. Downs said Travnicek was in college. It was Smith's understanding that Travnicek was a full-time college student, although she acknowledged

19

Downs never actually said Travnicek was a full-time student. But Downs never said he was not a full-time student either. Nor did Downs tell Smith Travnicek was not in college, despite the conversations about later documenting his grades for purposes of applying the good student discount in the future.

Smith testified that she believed Downs was being truthful with her. Smith testified that, other than relying on Downs's representation that Travnicek was back in Downs's household, there was nothing Smith could do. Smith explained that the company policy is to accept the truthfulness of statements made by insureds. Employees are trained to accept what insureds say as truthful. Smith testified that, had she known that Travnicek did not live in Downs's household, was not going to college, and instead was a full-time Marine living in Oceanside, she would have told Downs that she could not add Travnicek's vehicle to Downs's policy, and that Travnicek needed his own policy.

Muenzen testified that, while the premium for Travnicek on Downs's policy was $1,098, had Travnicek been insured as a nonmember of one of the targeted groups, his premium would have been $2,475 for one year. Muenzen testified that, pursuant to company policy, "we take the word of the insured unless there is evidence to the contrary that's presented or readily available." According to Muenzen, CCIE representatives ask the insureds questions, the insureds respond, and it was CCIE's policy to perform no further investigation.

**Access to Address Information**

Rios, Smith, and Muenzen each testified that the California DMV reports the customer service representatives receive do not supply the subject's address. However, Steven Hill, CCIE's own expert, testified that one can obtain addresses from the DMV. Thomas Richardson, also a CCIE employee, clarified that the claims department can obtain addresses from the California DMV while the underwriters cannot.

In addition to testifying about DMV reports, Hill, who was in the "insurance investigation profession," testified that, to verify where someone lives, he would "request that I get at least one, if not more, last-known addresses or reported addresses," and then he would perform "a skip trace using databases that" include addresses. Hill continued: "I would use that to start with. It may not be the address that was reported, but regardless, no matter what I find on paper, I have to verify it with physical contact, knocking on the door." Asked what he would bill to verify where a subject lived, Hill testified, "if I were retained to physically go to an address, for instance, in this case, in Camp Pendleton, it would be minimum. It would be $500."

**The Accident and the Settlement with Hunter's Widow**

Douglas Kroesch, an attorney, was retained by CCIE and investigated liability issues pertaining to Hunter's widow's wrongful death action. Based on his review of reports and other sources, Kroesch described his understanding of the accident. According to Kroesch, on December 3, 2005, the Travnicek vehicle was traveling northbound on Interstate 5. The pavement was wet. For some reason not stated, the driver of the Travnicek vehicle lost control. The vehicle collided on the right sustaining front-end damage and then spun across the freeway, coming to rest partly in the center median and partly in the number one lane. A Honda being driven by a Mr. Gollmer, meanwhile, was traveling at a very high rate of speed, also northbound. The Gollmer vehicle, travelling at possibly 100 miles per hour, struck the Travnicek vehicle and "literally ripped the car apart." Kroesch could not say whether the first impact was sufficient to cause Travnicek's and Douglas Hunter's deaths, but Kroesch had "no doubt . . . that the second impact had enough force to cause deaths." According to Kroesch, the "occupants of each of the vehicles had a blood alcohol reading over the legal limit, with Mr. Gollmer's being the highest."

Based on his research into the accident and his calculations concerning the likely damages that Hunter's widow could be awarded at a trial, Kroesch recommended that

21

CCIE accept her demand that CCIE pay her the policy limits on the policy. Faced with exposure far in excess of the $500,000 policy limit, Thomas Richardson made the decision to pay the policy limit.

**Downs's Testimony**

CCIE called Downs as a witness. Downs testified that Travnicek had two addresses she knew about, her home address in Lodi and Camp Pendleton. She initially testified that she knew he stayed with the Hunters, but would not agree with the characterization that he "lived there." Later, she testified he moved into the apartment, and did so at the same time as the Hunters to help them finance the rent. But, according to her understanding, the arrangement was "temporary" in that "[t]hey could move out any time if they got deployed." She had visited the apartment and testified that Travnicek kept only a futon, a lamp, and some civilian clothes in the apartment. He told her he kept his military clothes in the "dorm" on the base. She maintained the building where Travnicek lived on the base was referred to both as a dorm and barracks.

Downs initially testified Travnicek came home once or twice a month, sometimes for three to four days at a time. When confronted with her examination under oath testimony where she said he would visit once every other month, she said the frequency varied; sometimes he had three or four weeks off, sometimes he had only a two- or three-day weekend off. She acknowledged that he worked full-time at Camp Pendleton and was living in the barracks or in the apartment, but maintained he was sleeping and eating at her house on the weekend and when he had days off.

She testified that Travnicek told her he was sitting in on college classes, but she had no recollection of him being a full-time student. He told her that he was taking classes and talked about online classes and college classes. She testified that there are six college campuses on the base at Camp Pendleton and she assumed he was attending classes at one of those. When asked about the fact her financial records showed no payments to a college, she testified she paid her "children money direct." However, she

did not know what college she was paying for. She said the reason she testified at the examination under oath that Travnicek was only taking online courses was because she "couldn't remember."

She testified she did not know the customer service representatives needed to know Travnicek was a full-time marine working in Camp Pendleton. She said if they needed to know that, she would have assumed they would have asked. She maintained that Travnicek's home was her house in Lodi. He was registered to vote at her address in Lodi. She believed he could be a household member and still be in the Marines, in a dorm at Camp Pendleton. Downs testified she had been telling CCIE representatives that Travnicek was a Marine at Camp Pendleton for three years and according to her, "they already had those notes."

Downs testified that CCIE deducted money from her account for the premiums for Travnicek's vehicle until January 2007. At that time, she closed her account because CCIE would not stop taking the premiums out of the account.

## Trial Evidence Presented by Downs

Thomas Corridan testified as Downs's expert. Corridan acknowledged that "there certainly were some factual questions regarding the issue of residency." He asserted that "there was evidence to support the fact that [Travnicek] was a resident of the household and that ultimately if the underwriting department discerned there were questions in their mind, they should have fleshed them out."

Corridan testified that CCIE could have run Travnicek's Geico policy "into the . . . underwriting index to see what kind of coverage they had with Geico." Corridan also testified that CCIE could have contacted Geico for residence information, and if Geico resisted, CCIE could have obtained authorization from the insured to release the information.

Corridan testified that options available to Rios if she disbelieved Downs's representations included declining to write the coverage or "she could have said, well,

23

we're not going to do that until we have verification of the . . . items that she in her mind questioned."

On cross-examination, Corridan acknowledged that CCIE customer service representatives asked Downs on at least four occasions if Travnicek was a member of her household. Discussing whether Travnicek could be considered part of Downs's household, Corridan acknowledged that, at the relevant times, Travnicek was "in the barracks or at the apartment or hotel or whatever." However, Corridan further testified that he thought "one could say he is in the household." "[H]e could still be a member of the household even though he's not there 100 percent of the time."

Asked if a customer service representative has the right to rely on the truthfulness of the representations made by Downs, Corridan responded, "[o]nly so far as they are convinced that it's not [*sic*] true, or they believe it's not [*sic*] true." Corridan testified that if a customer service representative has "substantial questions about the validity of the information they're getting," the representative should "either flesh it out further to get the facts or tell them, we can't do anything until I verify certain things that are -- I question."

<b>Statement of Decision</b>

The trial court filed its statement of decision on October 5, 2009.[6] The court stated that, after listening to witness testimony and recordings of telephone conversations between Downs and the CCIE customer service representatives, "there was no question in the court's mind that" Downs "deliberately misstated material facts and tried to mislead Rios and Smith about" Travnicek's status as a member of Downs's household so as to qualify for reduced premiums. The court stated that a number of Downs's responses during the telephone conversations were not true, noting specifically that Travnicek was

---

[6] We discuss the procedural events leading up to the statement of decision, *post*.

24

neither living at home nor a college student. The court wrote: "[Downs] was unconvincing to the court, as she was misleading to Rios and Smith. It was obvious that she meant to mislead both Rios and Smith to get a lower rate for [Travnicek's] Volvo."

As to Downs's estoppel defense, the court stated: "Rios'[s] answers to [Downs's] counsel's questions at the trial as to whether she believed [Downs] lied about [Travnicek] being a member of the . . . household raised the estoppel issue." The court noted that, while Rios testified unequivocally that she believed Downs lied about Travnicek being a member of the household, Rios did not share that belief with anyone. However, the court stated that, because Rios was an agent of CCIE, what she believed was the same as CCIE having that belief. The court further stated that, by not acting on her belief, and adding Travnicek to the policy, Downs and Travnicek were led to believe that Travnicek was covered. Additionally, the court emphasized that Rios and Smith knew that Downs and Travnicek intended to cancel Travnicek's coverage under the Geico policy when he was added to Downs's policy. Therefore, the court stated, if CCIE was permitted to rescind its policy, Downs and Travnicek would be "absolutely naked as far as exposure for [Travnicek's] tragic fatal automobile accident, as well as any rights they may have had of their own under that policy." The court noted that, under California insurance law, CCIE was required to pay the Hunter claim.

The trial court reasoned that "this case is controlled by" *Barrera,* [*supra*, 71 Cal.2d 659]. The court stated that, while *Barrera* was factually distinguishable because it involved the duty of an insured to an injured third party, the rationale was "in accord with the facts of this case." The trial court also noted that in *Barrera*, State Farm could have checked the insured's DMV record to learn about his driver's license suspensions, whereas, here, the addresses of license holders were not furnished on the California DMV reports reviewed by customer service representatives. However, the trial court stated that there were other reasonable means available to CCIE to discover the veracity of Downs's representations, including having a supervisor "diplomatically" request verification of

25

Travnicek's college residence or mailing Downs a letter making clear the consequences of making material misrepresentations in applying for insurance. What CCIE could not do, according to the trial court, was to do nothing until a claim was filed.

The trial court continued: "There is no question that [Downs] [is] benefitting from [her] deliberate misrepresentation to [CCIE's] agents—Rios and Smith. But as the reasoning of the *Barrera* case illustrates, a far greater harm would be perpetrated if [CCIE's] reasoning prevailed and the court rescinded the policy under the facts of this case where [CCIE] could have, and should have, avoided any liability had Rios acted responsibly and not remained silent after believing [Downs] lied. To see the harm that rescission would now cause, if [Downs] had given the true facts to Rios about [Travnicek's] status, there would have been only an additional premium of approximately $1,000. But if [CCIE] is allowed to rescind when it did nothing about Rios'[s] belief until after the accident, the damages to [Downs] would be . . . $1,000,000 or more. A risk [CCIE] would have assumed without any dispute for an additional $1,000, and a risk that [CCIE] actuarially factors into its premium rates."

The trial court concluded: "Any right [CCIE] had to rescind the . . . policy covering [Travnicek] and his Volvo was lost by [CCIE's] failure to exercise due diligence in determining whether Rios'[s] belief that [Downs] was lying was correct . . . . Therefore, the court finds that [CCIE] is estopped from bringing an action for Rescission and the court finds in favor of [Downs] on all causes of action brought by [CCIE]."[7]

The trial court entered judgment in favor of Downs and CCIE appealed. We granted Downs's motion to dismiss that prior appeal on the ground that the appeal was premature as the judgment on the bifurcated complaint was not a final resolution of all

---

[7] We discuss CCIE's objections to the statement of decision, *post*.

issues between the parties.  Downs's cross-complaint regarding her uninsured motorist claim had not yet been adjudicated.

## Arbitrator's Award

The trial court granted CCIE's motion to compel arbitration of Downs's cross-complaint.  Instead of the $485,000 Downs sought, the arbitrator awarded Downs $50,000.  The arbitrator found that Downs deliberately misstated material facts and attempted to mislead CCIE employees as to Travnicek's status as a member of Downs's household to obtain lower premiums.  The arbitrator concluded:  Downs "engaged in conduct which makes it very difficult for the Arbitrator to make an award extending benefits.  *Barrera* provided her with a shield and now she seeks to go a step further and use it as a 'sword' to collect benefits.  [¶]  That being said, CCIE is not blameless.  Their representative unequivocally believed that [Downs] was not being honest and yet CCIE did nothing about it and accepted the premium and risk.  As evidenced by *Barrera* that is a serious failure to act.  [¶]  After taking all of the foregoing into consideration, the Arbitrator hereby awards [Downs] the sum of $50,000.00."

## Judgment

The trial court entered judgment consistent with the statement of decision and the arbitrator's award, in favor of Downs both on CCIE's complaint and on the arbitrator's award awarding Downs $50,000.  CCIE again appealed.

## DISCUSSION

### I.  Standard of Review

"In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo.  [Citation.]  We apply a substantial evidence standard of review to the trial court's findings of fact.  [Citation.]  Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings."  (*Thompson v. Asimos* (2016) 6

27

Cal.App.5th 970, 981 (*Thompson*).) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1045.)

## II. *Barrera* Duty to Investigate

### A. The *Barrera* Decision

In *Barrera, supra*, 71 Cal.2d 659, the insured applied for automobile insurance with the defendant State Farm Mutual Automobile Insurance Company (State Farm), and State Farm issued the policy. (*Id*. at p. 664.) The insured knowingly misstated a material fact on the application, stating that his license had never been suspended, revoked, or refused in the previous five years. In fact, a DMV report showed one suspension and two probation orders within that time frame. (*Id*. at p. 665.) Thereafter, the insured's wife struck the plaintiff while she was driving. (*Id*. at p. 664.) After being notified of the plaintiff's claim, State Farm rescinded the policy and returned all premiums to the insured. (*Ibid*.) The plaintiff contended that State Farm was estopped from rescinding the policy because it led the insured to believe that he was insured, and because State Farm "negligently failed to discover within a reasonable time the misrepresentation in the application . . . ." (*Id*. at p. 662.)

Our high court stated: "an automobile liability insurer must undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy. This duty directly inures to the benefit of third persons injured by the insured. Such an injured party, who has obtained an unsatisfied judgment against the insured, may properly proceed against the insurer; the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application." (*Barrera, supra*, 71 Cal.2d at p. 663.) "If the insurer does undertake a reasonable investigation of insurability, it retains the statutory

28

right granted in section 650 of the Insurance Code[8] to declare the rescission of the policy because of a material misrepresentation of the insured.  When the insurer fails, however, to conduct such a reasonable investigation it cannot assert such a right of rescission.  The insurer cannot complain of the denial of the statutory right, when its conduct is culpable and directly contributes to the presence on the highway of a financially irresponsible motorist." (*Barrera*, at p. 678, fn. omitted.)

The court reasoned:  "With respect to an insurance policy voidable under the Insurance Code, if an automobile liability insurer can perpetually postpone the investigation of insurability and concurrently retain its right to rescind until the injured person secures a judgment against the insured and sues the carrier, then the insurer can accept compensation without running any risk whatsoever.  Such a rule would permit an automobile liability insurer to continue to pocket premiums and take no steps at all to probe the verity of the application for the issued policy unless and until the financial interest of the insurer so dictated.  *Furthermore, under such a rule, the carrier would be permitted to deal with the insured as though he were insured, and thus to lead him to believe that he was in fact insured*." (*Barrera, supra*, 71 Cal.2d at p. 670, italics added.)

The *Barrera* court further reasoned:  "the 'quasi-public' nature of the insurance business and the public policy underlying the Financial Responsibility Law [citation] impose upon the automobile liability insurer *a duty both to the insured* and to the public to conduct a reasonable investigation of insurability within a reasonable time after issuance of an automobile liability policy." (*Barrera, supra*, 71 Cal.2d at pp. 667-668, italics added.)  "[I]n order to avoid liability to an innocent victim of the insured an insurer

---

8 Section 650 provides:  "Whenever a right to rescind a contract of insurance is given to the insurer by any provision of this part such right may be exercised at any time previous to the commencement of an action on the contract.  The rescission shall apply to all insureds under the contract, including additional insureds, unless the contract provides otherwise."

cannot take advantage of a breach of its duty reasonably to check an application for automobile liability insurance within a reasonable time after acceptance of that application." (*Id*. at pp. 668-669, fn. omitted.) This rule "finds its source in the quasi-public nature of the insurance business and the *reasonable expectation of the applicant* and the general public. 'Since insurance companies are held to a broader legal responsibility than are parties to purely private contracts, having solicited and obtained an application for insurance and having received payment of a premium, they are bound either to furnish indemnity or decline to do so within a reasonable time.' " (*Id*. at p. 673, italics added.)

Our high court further noted: "That a person seeking to avoid liability by relying on material misrepresentation occurring prior to the plaintiff's acquisition of a cause of action must show due diligence in discovering that misrepresentation is a well-recognized equitable principle. 'The rule is well established that the means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive, and afterwards allege a want of knowledge that arose by reason of his own laches or negligence.' " (*Barrera, supra*, 71 Cal.2d at p. 669, fn. 7.)

However, the *Barrera* court noted that although an insurer loses it's right to rescind, it is not without remedy. The court stated: "That the automobile liability insurer that fails to make such an investigation loses its right to rescind does not, however, necessarily mean that it forfeits all remedies *against the insured* for his misrepresentations. The insurer may still prosecute a cause of action against the insured for damages for wrongful misrepresentation, after satisfying the injured person's claim, or, in an action brought by the insured, after he has satisfied a judgment against him by the injured person, defend on the ground of misrepresentations in the application." (*Barrera, supra*, 71 Cal.2d at p. 681.)

30

## B.  CCIE's Contentions

CCIE asserts that the trial court misinterpreted *Barrera* by incorrectly extending the insurer's duty to investigate as a bar to recovery against an insured who made material misrepresentations.  According to CCIE, the duty contemplated in *Barrera* applies *only* to innocent third parties, not to an insured who defrauded the insurer to get insurance.  CCIE maintains that the Supreme Court in *Barrera* extended an insurer's duty to investigate third parties not in privity with the insurer for the sole purpose of protecting innocent third parties from being unable to be made whole after being injured.  CCIE points out that *Barrera* created a corollary right in the insurer that fails to investigate to recover damages from the insured who made fraudulent misrepresentations for payments made by the insurer to injured third parties.  Thus, according to CCIE, a defrauded insurer is not estopped under *Barrera* from recovering from the insured who made fraudulent and material misrepresentations.

## C.  Analysis

The court in *Barrera* plainly held that an insurer loses its right to rescind a policy based on the misrepresentations of the insured where it has failed to perform a reasonable investigation, and thus it may not avoid liability to an injured third party.  (*Barrera, supra*, 71 Cal.2d at p. 678.)  And it held that an insurer that failed to perform a reasonable investigation can nevertheless prosecute a cause of action against the insured for damages for wrongful misrepresentation, after satisfying the injured person's claim, or, in an action brought by the insured, defend on the ground of misrepresentations in the application.  (*Id*. at p. 681.)

CCIE focuses on the *Barrera* court's observation that the duty to perform a reasonable investigation it imposed "inures to the benefit" of third parties injured by the insured.  (*Barrera, supra*, 71 Cal.2d at p. 663.)  CCIE's argument suggests that protecting these third parties was to be the only interest protected by the duty and that the duty does not extend to people like Downs, who make fraudulent representations in obtaining a

31

policy. But our high court was clear that the duty extends to both the insured and the public. As we have noted, the *Barrera* court sought to prevent insurance carriers from "pocketing premiums" and dealing with "*the insured as though he were insured, and thus to lead him to believe that he was in fact insured.*" (*Id.* at p. 670, italics added.) The court went on to note that the duty to conduct a reasonable investigation imposed upon the insurer is a "duty *both to the insured* and to the public." (*Id.* at pp. 667-668, italics added.)

In *Philadelphia Indemnity Ins. Co. v Montes-Harris* (2006) 40 Cal.4th 151 (*Philadelphia Indemnity*), our high court discussed *Barrera*. The court wrote: "*Barrera* sought to avoid a rule that, in practice, would (1) *produce the 'dangerous condition' that car owners and operators would drive with the erroneous belief they are insured*, and (2) frustrate the expectation of those using the streets and highways that insurance companies would conduct their business in such a way as to fulfill, not thwart, the [Financial Responsibility Law]'s public policy purpose." (*Philadelphia Indemnity*, at p. 159, italics added.) Based on the text we have italicized from *Barrera* and *Philadelphia Indemnity*, we reject defendant's contention that *Barrera* did not extend the duty it created to cover insureds who make misrepresentations to obtain their policy.

However, *Barrera* does not address the specific issue in this case: whether an insurer may be *estopped* from rescinding the policy and recovering from its insured for material misrepresentations specifically where the insurer believes that the insured is lying in order to obtain coverage but fails to perform any further investigation. We agree with CCIE to the extent it contends that *Barrera* is not necessarily a bar to its recovery from Downs of the payment it made to Hunter's widow. But we also agree with Downs that *Barrera* does not preclude estoppel as a defense to an insurer's claim for fraudulent misrepresentation.

32

### III. Relevant Insurance Code Provisions

CCIE also asserts that *Barrera* is consistent with the Insurance Code provisions regarding misrepresentation and concealment. CCIE cites Insurance Code sections 330, 332, and 359. But none of these Insurance Code provisions bar an insured who has made misrepresentations from an equitable estoppel defense and none prevent the trial court from applying equitable estoppel to deny relief to CCIE here.

Insurance Code section 330 defines concealment: "Neglect to communicate that which a party knows, and ought to communicate, is concealment."

Insurance Code section 331 provides: "Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."

Insurance Code section 332 provides: "Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."

Insurance Code section 359 provides: "If a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false."

CCIE asserts that, under these provisions, Downs had the obligation to communicate all facts within her knowledge that were material to the contract. We agree. CCIE further asserts that there is no evidence supporting any conclusion other than that Downs knew of the importance CCIE attached to information concerning Travnicek's status as a full-time student, but she avoided disclosing the fact he was instead a full-time active-duty Marine. We agree with this assertion as well. Downs had a duty to convey information under Insurance Code section 332, and the trial court determined that she concealed information in violation of Insurance Code section 330 and made material false representations in violation of Insurance Code section 359. However, that only gets CCIE so far.

33

CCIE failed to mention Insurance Code section 336 in its opening brief and would apparently have us overlook the code's recognition of a waiver defense. Insurance Code section 336 provides: "The right to information of material facts may be waived, either (a) by the terms of insurance or (b) *by neglect to make inquiries as to such facts, where they are distinctly implied in other facts of which information is communicated.*" (Italics added.) In other words, "[t]he insurer's right to disclosure of material facts may be waived by its own failure to follow up obvious leads." (*Old Line Life Ins. Co. v. Superior Court* (1991) 229 Cal.App.3d 1600, 1606 (*Old Line Life*).) "Waiver may also apply where a party acts in a manner inconsistent with the intent to enforce a right." (*Colony Ins. Co. v Crusader Ins. Co.* (2010) 188 Cal.App.4th 743, 753 (*Colony Ins.*).) "[I]n the insurance context the terms 'waiver' and 'estoppel' are sometimes used interchangeably, even though estoppel requires proof of the insured's detrimental reliance . . . . 'California courts will find waiver when a party intentionally relinquishes a right *or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.*' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 33; *Colony Ins.*, at p. 753, italics added.)

Downs asserts that her evasions and inconsistencies conveyed information that distinctly indicated she was lying and that CCIE had knowledge more than sufficient to lead a reasonable person to investigate further. Yet CCIE did nothing. We agree. CCIE failed to follow up on an "obvious lead[]." (*Old Line Life, supra*, 229 Cal.App.3d at p. 1606.) And it acted in a manner inconsistent with the intent to enforce the right to rescind by issuing the policy and collecting premiums for Travnicek's Volvo. (*Colony Ins., supra*, 188 Cal.App.4th at p. 753.)

The Insurance Code provisions upon which CCIE relies do not bar application of equitable estoppel. To the contrary, as Insurance Code section 336 and the aforementioned authorities indicate, the Insurance Code contemplates situations where an insurer may forfeit its right rescind or be estopped from rescinding and claiming

damages.  Consequently, while CCIE accurately describes certain provisions of the Insurance Code, they are not dispositive on this appeal.

### IV.  Estoppel Based on Failure to Investigate

### A.  CCIE's Contentions

CCIE asserts that the suspicions of a customer service representative regarding an insured's statements do not obligate the insurer to investigate.  According to CCIE, applicable case law establishes that "suspicions are not knowledge" and that an insurer's suspicions that the insured made misrepresentations does not estop the insurer from asserting fraud against the insured.  According to CCIE, actual knowledge regarding the falsity of the insured's misrepresentations is required to estop an insurer from asserting misrepresentation as a defense.  CCIE maintains that the suspicions of Rios, who was not even the customer service representative who ultimately issued the policy, were not sufficient to give rise to an estoppel.

### B.  Analysis

CCIE relies on *Anaheim Builders Supply v. Lincoln National Life* (1965) 233 Cal.App.2d 400 (*Anaheim Builders*) for the proposition that an insurer will be estopped from asserting a claim for misrepresentation only if the insurer had actual knowledge regarding the falsity of the insured's representations.  There, a business sued for the face amount of a life insurance policy written on one of its key officers, Palm.  The insurance company defended on the ground that Palm had misrepresented his health on the policy application.  (*Id*. at p. 403.)  Although the insurance company requested further information about some of Palm's answers from his doctor and the doctor never responded to the request, the policy was issued anyway.  (*Id*. at p. 410.)  The appellant argued that this amounted to a waiver of the right to insist the policy was voided by the misrepresentations and concealment.  (*Ibid*.)  The *Anaheim Builders* court stated:  "An essential element of both estoppel and of waiver is knowledge of the true facts.  There can be no waiver of a right to charge fraud or misrepresentation, except when there is an

35

intention to relinquish a known right." (*Ibid*.) Based on this, CCIE argues actual knowledge is required. But CCIE would apparently have us ignore that the *Anaheim Builders* court also noted Insurance Code section 336 and went on to state: "[I]t is also true that if an insurance company has actual knowledge sufficient to lead a reasonably prudent person to inquire further relative to representations made by a proposed insured, this may constitute notice of whatever the inquiry would have disclosed." (*Id*. at p. 411.) The court went on to conclude there was no waiver or estoppel in that case because the record did not indicate "the insurance company ever had any information prior to the death of [the officer] of any fact which differed from the representations which he made in the application, and it does not seem that there is anything in the answers to the questions in . . . the application which distinctly implies the existence of facts to the contrary of what is said." (*Ibid*.) Here, in contrast, Rios concluded that Downs was indeed lying about material information.

CCIE relies on *Maggini v. West Coast Life Ins. Co.* (1934) 136 Cal.App. 472 (*Maggini*) for the proposition that "suspicion" of falsity is not enough to trigger a duty to investigate. In *Maggini*, in his application, the insured was alleged to have made several misrepresentations about his health and medical history related to previous respiratory illnesses. (*Id*. at pp. 474-475.) The insured died of bronchial pneumonia. (*Id*. at p. 474.) He previously had pneumonia, but failed to disclose that fact. (*Ibid*.) He also had several other "pulmonary ailments which caused shortness of breath and the spitting of blood," but failed to disclose those illnesses as well. (*Id.* at p. 475.) The insurer had received a written report in which the prior pneumonia was referenced and which indicated the insured had fully recovered. (*Ibid*.) The plaintiff asserted "that the insurer had knowledge of the falsity of the statements of the insured prior to the execution of the policy and therefore must be deemed to have waived the fraud and must be held estopped to defend on that ground." (*Ibid*.) Specifically, plaintiff asserted the insurer had information as to the prior bout of pneumonia based on the report. (*Ibid*.) The court

concluded, "[T]he evidence is clear that the [insurer] did not have any knowledge of the falsity of any of these misrepresentations except that relating to the illness of the insured five years prior to the date of the policies. *This may have been sufficient to raise a suspicion as to the truth of other representations relied on; but cause for suspicion does not constitute knowledge.* Hence there could be no estoppel of the insurer's right to 'set up the fraud by way of defense to an action brought to enforce the apparent liability.' " (*Id.* at p. 479, italics added.)

As Downs asserts, the trial court did not find that Rios had "cause for suspicion" concerning Downs's alleged misrepresentations. Rather, in the statement of decision, the trial court noted that Rios in her testimony "unequivocally answered that she believed [Downs] was lying . . . ." Rios, thus, had more than a suspicion. Indeed, she had more than "knowledge sufficient to lead a reasonably prudent person to inquire further relative to representations made by a proposed insured." (*Anaheim Builders, supra*, 233 Cal.App.2d at p. 411.)

As for *Maggini*, as Downs asserts, the issues in that case are different from those here. In *Maggini*, the court wrote, "The real issue presented by the record is this: when the insurer has knowledge of some misrepresentation on the part of the insured and elects to waive that fraud, *is the insurer thereby estopped from raising other frauds of which it had no knowledge?*" (*Maggini, supra*, 136 Cal.App. at p. 476, italics added.) In contrast to *Maggini*, Rios unequivocally stated she did not believe Downs's representations which related to the issue which is the subject of the estoppel.

CCIE emphasizes that Rios was not the customer service representative who issued the policy, but instead she only offered a quote and took no further action. This, however, is not truly representative of the trial testimony. Discussing the policy comment she drafted summarizing her conversation with Downs, Rios testified that her purpose was to inform the next customer service representative who might speak with Downs of everything Rios covered in her discussion, and to indicate that she had already

37

determined that Travnicek was back in the household. Rios's testimony indicates that she had actually made the determination that Travnicek was again part of the household, and that, when another customer service representative fielded Downs's forthcoming call to furnish the Volvo's VIN, that customer service representative need not make that determination because Rios already had. Smith testified that, during her September 28, 2005, conversation with Downs, she reviewed the policy comments prepared by Rios on September 26, 2005, and saw that Rios had already spoken with Downs and that Travnicek was back in the household so CCIE could add Travnicek and his Volvo to the policy. Smith testified that she relied solely on the policy comment prepared by Rios as establishing Travnicek's living situation.

Moreover, Rios's beliefs here are CCIE's beliefs. An agent's knowledge is imputed to the principal, because "both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other." (Civ. Code, § 2332.) Thus, we disagree with CCIE to the extent that it argues that, because Rios merely issued a quote and took no further action, her belief as to Downs's misrepresentations is irrelevant.

On redirect, Rios testified that she was not sure which was true, that Travnicek was living in Downs's Lodi house, or that he was "living in college -- or at a dorm in college." However, she testified that she believed one or the other was true. No further explanation was given for this belief. Based on Rios's belief that Travnicek was either living at home or in a dorm, CCIE argues that neither Rios nor CCIE was required to take any further action because Travnicek would properly be added to the policy under whichever representation was true. However, Travnicek's status as a full-time student was not satisfied by information that he was living in the dorm. According to Watkin's testimony, Travnicek did not need to be a full-time student if he lived with Downs, but, according to Rios, he needed to be a full-time student if he was not living in Downs's home.

Indeed, Downs never represented that Travnicek was a full-time student. When Rios asked Downs if Travnicek was a full-time student, Downs responded: "Um at this point I don't know if he is you know he was trying for it but he didn't get all of the classes so he is sitting in on some, so I believe he will be."

Moreover, we are not necessarily persuaded that, where a customer service representative affirmatively believes an insured is lying to obtain coverage, the insurer has no duty to investigate further if one of the insured's representations may be true but the other about the same material issue is a lie. This case is different from *Maggini* where the insurer knew of a prior episode with pneumonia from which the insured had "fully recovered" (*Maggini*, *supra*, 136 Cal.App. at p. 475), but had no knowledge of a series of other respiratory illnesses. In the circumstances of the instant case, the fact that the insured made two different representations about the material issue of living arrangements might indicate that neither of them was true. In such a situation the insurer would have "actual knowledge sufficient to lead a reasonably prudent person to inquire further relative to representations made by a proposed insured, [and] this may constitute notice of whatever the inquiry would have disclosed." (*Anaheim Builders, supra*, 233 Cal.App.2d at p. 411.)

Moreover, as our high court in *Barrera* noted, "That a person seeking to avoid liability by relying on material misrepresentation occurring prior to the plaintiff's acquisition of a cause of action must show due diligence in discovering that misrepresentation is a well-recognized equitable principle. 'The rule is well established that the means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive, and afterwards allege a want of knowledge that arose by reason of his own laches or negligence.' [Citation.] Thus, if a person has a duty to make inquiry, but unreasonably delays in conducting that inquiry which would reveal the fraud, his

39

negligent omission constitutes laches which bars his defense of fraud." (*Barrera, supra*, 71 Cal.2d at p. 669, fn. 7.)

Here, there was no evidence that CCIE planned any investigation of what Rios thought was a lie. Nothing was done in the two months before the accident to investigate Travnicek's residence and student status. CCIE did not begin an investigation until after the accident.

Rios's unequivocal belief that Downs was feeding her misrepresentations gave rise to a duty to investigate further. (*Barrera, supra*, 71 Cal.2d at p. 669, fn. 7.)[9] We will discuss in part V. of the Discussion, *post*, what Rios or CCIE might have done. What they could not do is what they did -- nothing. By doing nothing and approving of the coverage for Travnicek, CCIE led Downs and Travnicek to believe that Travnicek was insured. (*Id.* at p. 672 ["State Farm's alleged practice of postponing its investigation of insurability until after the assertion of a 'significant' claim produces the dangerous condition that owners of cars will be driving on the streets and highways in the erroneous belief that they are insured"].) CCIE could not do nothing, continue to receive payments for premiums, receive a claim, and then seek rescission based on the misrepresentations.

---

[9] In addition to Rios's assessment that Downs was lying in the 2005 conversation she had with her, there was information in CCIE's policy comments indicating this was not the first time Downs had lied. As we have noted, in 2003, Travnicek, who was still in the Marines, sought to rent a vehicle and inquired about obtaining his own policy. He then apparently had Downs call back to state he was back living in her home and obtain coverage for him on her policy, only to delete the collision coverage nine days later ostensibly because it was too expensive. This added to the actual knowledge that would lead a reasonably prudent person to inquire further when Downs claimed Travnicek was back in the home in 2005.

## V. Substantial Evidence of the Availability of a Reasonable Investigation

### A. CCIE's Contentions

CCIE asserts that even if it did have a duty to investigate, there is no substantial evidence defining any reasonable investigation that would have uncovered or prevented Downs's misrepresentations. CCIE asserts that it did what was reasonable under the circumstances in ordering a copy of Travnicek's DMV records and accident history. According to CCIE, no witness testified as to any method that would have been reasonable to disclose the truth of Travnicek's residence. CCIE notes that its expert, Steven Hill, testified that, to discover the truth of Travnicek's residence, he would have performed a "skip trace and personal visit," costing at least $500. CCIE contends that Travnicek's address could not be ascertained "through the DMV records or any other available database." CCIE maintains that its investigation was reasonable as a matter of law.

### B. Analysis

Whether or not the automobile liability insurer has breached its duty to make a reasonable investigation within a reasonable time after the issuance of the policy ordinarily constitutes a question for the trier of fact. (*Barrera, supra*, 71 Cal.2d at p. 681.) "Factors to be taken into account by the trial court in assessing the reasonableness of [the insurer's] course of conduct in failing to investigate [the insured's] driving record are, inter alia: the cost of obtaining the information from the Department of Motor Vehicles, the availability of this information from the department *or elsewhere* . . . , and the general administrative burden of making such an investigation. These factors must be weighed against the importance of the protection of innocent members of the public against the consequences of automobile owners driving with voidable liability policies." (*Id*. at p. 682, italics added.)

CCIE contends that address/residency information was not readily available to CCIE customer service or underwriting personnel from DMV reports, relying on Vehicle

Code section 1808.21, subdivision (a), which provides: "Any residence address in any record of the department is confidential and shall not be disclosed to any person, except a court, law enforcement agency, or other government agency, or as authorized in Section 1808.22 or 1808.23." CCIE calls to our attention one exception in Vehicle Code section 1808.22 to this nondisclosure rule, noting "For example, the DMV will release address information to an insurance company if the information is requested for the purpose of obtaining the address of another motorist or vehicle owner involved in an accident with the company's insured," under subdivision (b) of Vehicle Code section 1808.22. But as it did in the trial court, CCIE failed to mention in its briefing on appeal an exception in the very same subdivision that undercuts its argument. Vehicle Code section 1802.22, subdivision (b), in effect at the time Travnicek's vehicle was added to the Downs policy, read as follows: "Section 1808.21 does not apply to an insurance company licensed to do business in California when the company, under penalty of perjury, requests the information for the purpose of obtaining the address of another motorist or vehicle owner involved in an accident with their insured, *or requests the information on an individual who has signed a written waiver of Section 1808.21 or the individuals insured under a policy if a named insured of that policy has signed a written waiver.*"[10] (Stats. 2003, ch.

---

[10] In 2010, subdivision (b) of Vehicle Code section 1808.22 was amended to separate the two exceptions into separate subdivisions. Subdivision (b)(1) now provides: "Section 1808.21 does not apply to an insurance company licensed to do business in California, or to an authorized contractor acting on behalf of that insurance company, pursuant to a contractual agreement, if the company or contractor, under penalty of perjury, requests the information for the purpose of obtaining the address of another motorist or vehicle owner involved in an accident with the company's insured." Subdivision (b)(2) now provides: "Section 1808.21 does not apply to an insurance company licensed to do business in California if the company, under penalty of perjury, *requests the information on an individual who has signed a written waiver of Section 1808.21 or on the individuals insured under a policy if a named insured of that policy has signed a written waiver.*" (Stats. 2010, ch. 353, § 1 (A.B. 953), italics added.)

649, § 2 (A.B. 1675), italics added.) All CCIE had to do was to ask Downs or Travnicek for a written waiver so that it could obtain DMV's information about Travnicek's address. We, of course, realize that if Travnicek had never updated his residency information with DMV after he moved out of his mother's home, DMV's information would not have given CCIE accurate information. But the point is that CCIE did not even try to investigate Travnicek's residence through DMV and the administrative cost would appear to have been minimal. Had it done so and the DMV record indicated Travnicek was residing at Downs's Lodi address, CCIE would have a more compelling argument. Since it did not seek a waiver from Downs or Travnicek and since it neglected to inform both the trial court and this court that it could have sought such a waiver, its argument about the accuracy of DMV residence information is severely undermined.

Moreover, Thomas Corridan, Downs's expert, testified that CCIE could have run Travnicek's Geico policy into the "underwriting index to see what kind of coverage they had with Geico." He further testified that CCIE could have contacted Geico for information reflecting Travnicek's residence, and that, if Geico resisted giving such information, CCIE could have obtained authorization from the insured to release the information. While CCIE does not appear to dispute the premise that it could have sought the Geico information by asking for a release, CCIE asserts that it is unlikely that a release would have been authorized. Corridan also testified regarding the addition of Travnicek and his Volvo to Downs's CCIE policy that Rios "could have said, well, we're not going to do that until we have verification of the . . . items that she in her mind questioned."

The trial court stated that there were reasonable means available to CCIE to discover the truth of Downs's representations, including having a supervisor request verification of Travnicek's college residence or mailing Downs a letter making clear the consequences for making material misrepresentations in applying for insurance. It seems clear to us that CCIE could have asked Downs to submit documentation of Travnicek's

43

enrollment in college, his residence in a dorm, or other school records, which, in turn, would have indicated whether he was a full- or part-time student and may have indicated where he lived when not attending school. Such a request would have resulted in little to no administrative burden.[11] And as counsel for CCIE candidly admitted during oral argument, if CCIE had requested consent to obtain either the Geico or school records, Downs would have had to "fess up" about her misrepresentations.

We conclude that substantial evidence supports the conclusion that the means of conducting a reasonable investigation into whether Travnicek was a member of Downs's household were available to CCIE, without having to do a "skip trace."[12] The low-cost steps we have referenced could have been undertaken. Particularly in this case, where the customer service representative affirmatively believed that the insured was not being truthful about residency information, we conclude that substantial evidence supports the conclusion that the means of conducting a reasonable investigation into the truth of those representations were readily available to CCIE. We further conclude that, contrary to CCIE's contention, its actions in simply accepting Downs's representations, which Rios did not believe, did not amount to a reasonable investigation as a matter of law.

---

[11] Indeed, CCIE offers a good-student discount for full-time students who maintain a B average, carrying nine to 12 credits at an accredited college. To obtain this discount, CCIE requires the insured to submit documentation in the form of a transcript. On the other hand, Smith testified that no documentation is required to establish status as a student, full-time or part-time. CCIE simply takes the policyholder's word for it. When asked why CCIE requires documentation for the good-student discount, Smith testified, "Everyone can say they get good grades, but we need proof of it" and acknowledged that CCIE deemed it important to have grade information independently verified. But it seems to us that anyone could claim their child is a full-time student as well, and the administrative cost of requiring the insured to verify that is no more burdensome than it is to obtain documentation for the good-student discount.

[12] Hill testified about the cost of doing a skip trace: "for instance, in this case, in Camp Pendleton," it would be a minimum of $500. He did not testify what the cost would have been to visit the Downs's house in Lodi.

CCIE relies on *Philadelphia Indemnity, supra*, 40 Cal.4th 151, on the question of reasonable investigation. That case involved excess liability insurance for car rentals. Our high court stated that, "we asked the claimants what additional investigation should be required of excess insurers to ferret out rental car customers whose driver's licenses appear facially valid but in fact are suspended or revoked." (*Id*. at p. 162.) Among other things, the "claimants . . . suggested that rental car agents should affirmatively ask potential rental customers whether their driver's licenses have been suspended or revoked, and whether they have moved in the last year without notifying the DMV. They conceded, however, that such questioning might not be effective in those cases where . . . a customer tenders a facially valid license that he or she knows or has reason to know has been suspended or revoked." (*Id*. at p. 163) Ultimately, our high court concluded that the insurer's failure to conduct a further inquiry after being presented with a facially valid license and verifying the signature as required by statute "did not result in a forfeiture of its contractual rights under the excess policy's exclusion for accidents caused by the use of a vehicle obtained through fraud or misrepresentation." (*Ibid*.)

Relying on *Philadelphia Indemnity*, CCIE asserts that, here, "asking for verification of Travnicek's residence and stating the consequences of misrepresentation will likely not be effective where [Downs] has intentionally misrepresented material facts to get a lower rate." But as we have noted, CCIE did not have to take Downs at her word. It could have solicited waivers of confidentiality and obtained records from DMV, Geico, or Travnicek's purported college. Accordingly, the premise addressed in *Philadelphia Indemnity* and relied upon by CCIE here—that it would be futile to rely on questioning the potential defrauder as a means of verifying the necessary information— does not undermine our determination that substantial evidence supports the conclusion that reasonable means to investigate the truth of Downs's representations were available to CCIE.

## VI.  Implied Findings, Equitable Estoppel, and Fraudulent Misrepresentation

### A.  CCIE's Contentions

CCIE asserts that, because it filed timely objections to the statement of decision bringing asserted omissions to the attention of the trial court, implied findings cannot be used to support the judgment.  Specifically, CCIE contends that, in its objections, it "asserted both the deficiencies in the finding of estoppel, and the absence of any findings with regard to [CCIE's] other causes of action."  We disagree and conclude we are not barred from applying the doctrine of implied findings here.

### B.  Procedural Background

Before we discuss the law related to statements of decision and implied findings, we first outline the procedural history related to the statement of decision in this case because that history is critical to the application of rules concerning statements of decision and implied findings.

On August 25, 2009, the trial court filed an intended statement of decision (tentative decision).  Its ultimate statement of decision which we discuss *post* largely mirrored the tentative decision.  In the conclusion part of its discussion in the tentative decision, the court wrote:  "Any right Plaintiff had to rescind the [Downs] policy covering [Travnicek] and his Volvo was lost by Plaintiff's failure to exercise due diligence in determining whether Rios' belief that [Downs] was lying was correct . . . Therefore, the court finds that Plaintiff is estopped from bringing an action for Rescission *and the court finds in favor of [Downs] on all causes of action brought by Plaintiff, [CCIE].*"  (Italics added.)  In its tentative decision, the court advised the parties:  "Any party who wants a statement of decision must make its request within ten (10) days after this tentative decision.  Any request for a statement of decision must comply with CCP [s]ection 632."

On September 3, 2009, CCIE filed a demand for statement of decision pursuant to Code of Civil Procedure section 632.  CCIE requested a statement of decision on "the

46

issue of whether [Downs] deliberately misstated material facts and if so the facts she deliberately misstated," "the issue of rescission," "the issue of estoppel," and "the issues raised" in each of its causes of action *except* for the twelfth cause of action for fraud. Other than the reference to Downs's material misrepresentations, no controverted issues were specified as to the fraud cause of action. Indeed, nothing was expressly stated about the twelfth cause of action, even though the trial court had stated in its tentative decision that it found in favor of Downs on "all" of CCIE's causes of action.

On September 11, 2009, the court ordered counsel for Downs to prepare a statement of decision, noting that any objections to the statement of decision were to be filed within 15 days of service of Downs's statement of decision. Counsel for Downs complied and provided a proposed statement of decision.

On October 5, 2009, the trial court filed its statement of decision. On October 13, 2009, CCIE filed objections to the statement of decision. On October 19, 2009, the judgment on the bifurcated proceeding was filed.[13]

### C.  Procedural Requirements Related to Statements of Decision

Code of Civil Procedure section 632 provides that a "request for a statement of decision *shall specify those controverted issues* as to which the party is requesting a statement of decision." (Italics added.)  " '[U]nder [Code of Civil Procedure] section 634, if the statement of decision does not resolve a controverted issue or is ambiguous, and the omission or ambiguity was brought to the attention of the trial court, 'it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue.' " (*Thompson, supra*, 6 Cal.App.5th at p. 981.)  "Together,

_____

[13]  In its appellate briefing, CCIE asserted that the trial court "issued a 'judgment' on October 9, 2009, without waiting for the objections and without ruling on the objections to the Statement of Decision."  However, the record reflects the judgment was filed on October 19, 2009.  As for failing to rule on the objections, the trial court's issuance of the judgment implied it had overruled the objections.

47

sections 632 and 634, as implemented by rule 3.1590(d)-(g) of the California Rules of Court, establish a two-step procedure for requesting a statement of decision and preserving objections for pursuit on appeal. First, following the court's announcement of its tentative decision, section 632 requires a party to specify, in timely fashion and in proper form, 'those controverted issues as to which the party is requesting a statement of decision. After a party has requested the statement, any party may make proposals as to the content of the statement of decision. This initial step serves the function of advising the trial court of exactly what issues the parties view as materially controverted at the close of the evidence, just as the process of settling jury instructions serves to frame issues for decision by the fact finder in the jury trial setting. Second, section 634 requires that any omissions or ambiguities in the statement of decision must be 'brought to the attention of the trial court. . . thus allowing the court to respond to objections before the taking of an appeal. The second step is not a substitute for the first. Objections are germane only as to issues framed as materially controverted under section 632.' " (*Id*. at p. 982.)

"Where a party fails to 'specify . . . controverted issues' or otherwise 'make proposals as to the content' of a statement of decision under section 632 (forcing the trial court to guess at what issues remain live during preparation of the statement of decision), or where a party complies with section 632 but fails to object under section 634 (depriving the trial court of the opportunity to clarify or supplement its statement of decision before losing jurisdiction), objections to the adequacy of a statement of decision may be deemed waived on appeal." (*Thompson*, *supra*, 6 Cal.App.5th at p. 983.)

### D. The Doctrine of Implied Findings

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' [Citation.] Specifically, '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary

to support its decision.' " (*Thompson, supra*, 6 Cal.App.5th at p. 981.) However, "[w]hen a statement of decision does not resolve a controverted issue, or if the statement is ambiguous *and the record shows that the omission or ambiguity was brought to the attention of the trial court . . .* it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (Code Civ. Proc., § 634, italics added.)

To avoid the application of the doctrine of implied findings where the trial court issues a statement of decision, the requirements of both Code of Civil Procedure sections 632 and 634 must be satisfied -- that is the party must (1) specify the controverted issues as to which it is requesting a statement of decision after the court issues its tentative decision and (2) after a statement of decision is issued, the party must bring to the court's attention any omissions or ambiguities as to the controverted issues. (*Thompson, supra*, 6 Cal.App.5th at p. 982.) "Because either procedural defect impedes the trial court's ability to fulfill its duty under section 632 and potentially undermines the effectiveness of any statement of decision it prepares as a tool of appellate review, *strict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal*." (*Thompson*, at p. 983, italics added.)

As for objections, " ' "a party claiming omissions or ambiguities in the factual findings must bring the omissions or ambiguities to the trial court's attention" pursuant to [Code of Civil Procedure] section 634.' " (*Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 311-312 (*Orange County*).) " 'To bring defects in a statement of decision to the trial court's attention within the meaning of [Code of Civil Procedure] section 634, objections to a statement of decision must be "specific." [Citation.] The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect. [Citation.] "By filing specific objections to the court's statement of decision a party pinpoints alleged

49

deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous." ' " (*Orange County*, at p. 312.) "These requirements apply to omissions or ambiguities in a court's *factual* findings only. Since the doctrine of implied findings does not apply to the court's legal conclusions (which are reviewed de novo on appeal), this procedure does not apply to potential errors of law." (*Ibid*.)

### E. CCIE's Specification of Controverted Issues and Objections

As noted, after the trial court issued its tentative decision, CCIE filed a demand for statement of decision and listed as the controverted issues: Downs's material misstatements, "the issue of rescission," "the issue of estoppel" and "the issues raised" in each of its causes of action *except* for the twelfth cause of action for fraud. No specific reference was made to the twelfth cause of action.[14]

In its objections filed after the trial court issued its statement of decision, CCIE listed under the heading "Statement of Issues Declaring [sic] Clarification" the following: "1. The court should set forth the legal and factual basis for its conclusion that the *Barrera* 'Estoppel' should be used to protect the 'dishonest insured' as opposed to the

---

[14] In its briefing on appeal, CCIE asserts that it "was not required to request a [s]tatement of [d]ecision because the court, itself, ordered a [s]tatement of [d]ecision to be prepared." Again, CCIE misrepresents the record. The trial court, as required by Rules of Court, rule 3.1590, first announced its tentative decision. As we have noted, it did so in writing. In its tentative decision, the court ordered, "Any party who wants a statement of decision must make its request within ten (10) days after this tentative decision. Any request for a statement of decision must comply with CCP [s]ection 632." To address controverted issues, CCIE was thus required by the court's order, Civil Code of Procedure section 632, and Rule 3.1590(d) to file a request for statement of decision specifying all controverted issues. As previously noted, after the trial court issued its tentative statement of decision, CCIE did, in fact, file a request for statement of decision. It was then that the trial court ordered Downs to prepare a statement of decision. CCIE cannot avoid its obligation to specify all controverted issues by its unsupported contention that it was under no obligation to request a statement of decision.

50

injured tort victim;  [¶]  2.  The court should render a decision on [CCIE's] cause of action for damages for fraud, a cause of action specifically authorized by the *Barrera* court intended by the *Barrera* court to apply despite any estoppel, in favor of the injured tort victim; [¶]  3.  The court should clarify legally and factually why it feels that the 'elements of estoppel' are present in favor of [Downs] allowing her to recover in damages for her own fraud;  [¶]  4.  The court should clarify legally and factually why it believes that the 'suspicion' of Rios and Smith that [Downs] was not telling the truth is a basis for an estoppel;  [¶]  5.  The court must rule on all causes of action pled by [CCIE]." (Capitalization omitted.)  Specificity for each of these requests for clarification was set forth later in CCIE's objection under separate headings.**15**  We address the objection related to CCIE's cause of action for fraud, *post*.

### F.  Findings as to Downs's Estoppel Defense

### 1.  Sufficiency of CCIE's Specificity of Controverted Issues and Objections

After the trial court issued its tentative decision, CCIE specified as controverted "issues related to rescission," and "issues related to estoppel" in its request for a statement of decision.  (See Code Civ. Proc., § 632; *Thompson*, *supra*, 6 Cal.App.5th at p. 981.)  We shall assume, arguendo, that this specification was sufficient.

After the trial court issued its statement of decision, CCIE specified in its objections that the policy considerations in *Barrera* regarding protection of the public and injured third parties were not applicable here, and further stated that the trial court "has made no analysis or statement as to whether or not the elements of estoppel in favor of

---

**15**  We note that in the trial court, CCIE made numerous references to *Barrera*, purporting to quote or summarize our high court's decision without pinpoint citation.  We also note misleading statements in CCIE's trial court briefing concerning *Barrera*.  For example, CCIE wrote regarding our high court's decision:  "The court then went on to hold that the fact that the carrier had <u>no duty</u> to the insured would not be a bar to its obligation to pay the injured victim. (emphasis added.)"  [¶]  But the *Barrera* court never said the carrier had "no duty" to the insured.

[Downs] have been satisfied." CCIE continued: "The court in its statement of decision makes no ruling as to what it is that [Downs] relied upon. The court notes that — Rios and Smith had a suspicion that she was not telling the truth[16]— there is nothing in the record, however, that indicates that [Downs] was aware of that suspicion. The record is quite clear and the court[']s conclusion is quite clear that [Downs] knew the correct facts: that her son was not living at home, was in the Marine Core, [*sic*] was not going to college etc. There is nothing in the record that indicates that [CCIE] did anything to cause her to believe that they were aware of those facts or that they knew them to be false. As such, the court makes no finding showing that the estoppel elements are present. There is no showing for example that [Downs] was ignorant of the truth. There is no showing that any misrepresentation was made to her 'with knowledge, actual or virtual, of the facts. There is no showing that anything that [CCIE] did was intentional, actual or virtual, that the ignorant party act in reliance on.' [¶] In short, [Downs] knew the true facts. Therefore, upon what was she 'relying' upon. Is the court stating that a person who commits an intentional fraud has the right to rely upon the 'ignorance' of the receiving party. [¶] It is requested that the court clearly state the basis for its finding that the elements of estoppel are in fact present in this action." CCIE also requested that the trial court clarify whether or not it was finding that Rios had actual knowledge, or rather that she merely harbored a suspicion.

We conclude that CCIE's objections to the statement of decision—that the trial court failed to make express findings on the elements necessary for equitable estoppel to apply—were " 'identified with sufficient particularity to allow the trial court to correct the [alleged] defect' " and sufficiently " ' "pinpoint[ed] [the] alleged deficiencies in the

---

[16] The trial court never said in its statement of decision that Smith had a suspicion that Downs was not telling the truth or that she believed Downs was not telling the truth. As for Rios, the trial court never used the word "suspicion."

statement [to] allow[] the court to focus on the facts or issues [CCIE] contends were not resolved or whose resolution is ambiguous." ' " (*Orange County, supra*, 12 Cal.App.5th at p. 312; see Code Civ. Proc., § 634.)

However, the trial court was not obligated to do anything more here given what it had already written in the statement of decision. As we discuss *post*, contrary to the implications of CCIE's objections, it is not Downs's alleged misrepresentations that are the subject of the estoppel; it is CCIE's conduct. And, as we shall discuss, the trial court actually did make ultimate fact findings as to equitable estoppel.

### 2. General Principles of Equitable Estoppel

" ' "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' " (*Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37 (*Honeywell*).)

### 3. The Trial Court's Express Findings on Equitable Estoppel

"That it is the duty of the trial court to make findings on every material issue raised by the pleadings is a well-established principle of law." (*Coronet Credit Corp. v. West Thrift Co.* (1966) 244 Cal.App.2d 631, 647.) Downs pled estoppel and the matter was obviously at issue before the trial court.

However, " '[a] trial court rendering a statement of decision under Code of Civil Procedure section 632 is required only to state ultimate rather than evidentiary facts. A trial court is not required to make findings with regard to detailed evidentiary facts or to make minute findings as to individual items of evidence. Only where a trial court fails to make findings as to a material issue which would fairly disclose the determination by the trial court would reversible error result. Even though a court fails to make a finding on a particular matter, if the judgment is otherwise supported, the omission is harmless error

53

unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings. . . . In issuing a statement of decision, the trial court need not address each question listed in a party's request. All that is required is an explanation of the factual and legal basis for the court's decision regarding such principal controverted issues at trial as are listed in the request.' " (*Kazensky v. City of Merced* (1998) 65 Cal.App.4th 44, 67-68 (*Kazensky*); accord *Thompson, supra*, 6 Cal.App.5th at p. 983.)

"[T]he term 'ultimate fact' generally refers to a core fact, such as an essential element of a claim. [Citation.] Ultimate facts are distinguished from evidentiary facts and from legal conclusions." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513; accord *Thompson, supra*, 6 Cal.App.5th at p. 983.) We conclude that the elements required for equitable estoppel to apply would constitute "a core fact, such as an essential element of a claim." (*Central Valley*, at p. 513; accord *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559.)

Before considering whether the trial court made express findings as to each of the four estoppel elements, however, we must identify what it is that is the specific subject of the estoppel here. " '*Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief*, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it.' " (*Honeywell, supra*, 35 Cal.4th at p. 37, italics added.) The subject of the estoppel here—CCIE's "statement or conduct" —is CCIE's silence about its belief that Downs was lying in attempting to obtain coverage for Travnicek and his Volvo, its tacit representations that it believed Downs, its representation that Travnicek would be covered, and the addition of Travnicek and his Volvo to the policy. Thus, if estoppel applies, CCIE would be estopped from contradicting that conduct by stating now that it disbelieved Downs and that Travnicek was not covered. Contrary to the

54

implications in CCIE's objections to the statement of decision, it is not Downs's alleged misrepresentations that are the subject of the estoppel found by the trial court.

We now turn to the four elements of estoppel, and whether the trial court made express findings on them. First, the trial court's express findings addressed whether " ' "the party to be estopped [was] apprised of the facts." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37.) The trial court expressly stated that Rios believed that Downs made misrepresentations in attempting to gain coverage for Travnicek. By agency principles, CCIE's knowledge was the same as Rios's knowledge. (Civ. Code, § 2332.) Thus, CCIE was apprised of the facts that Downs misrepresented the truth in her statements to Rios.

Second, the trial court's express findings addressed whether CCIE " ' "intend[ed] that [its] conduct shall be acted upon, *or . . . so act[ed] that the party asserting the estoppel had a right to believe it was so intended*." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37, italics added.) The trial court expressly found that CCIE added coverage for Travnicek. The trial court expressly found that Downs and Travnicek "were led to believe that they were covered by [CCIE's] auto policy." The court further mentioned the cancellation of the Geico policy, when it observed, "Both Rios and Smith knew [Downs] and [Travnicek] were canceling the Geico coverage thinking they were covered under the [Downs's] policy."

Third, the trial court's findings addressed whether " ' "the other party [was] ignorant of the true state of facts." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37.) In the statement of decision, the trial court stated that, while Rios believed that Downs lied, Rios "kept that belief to herself." Because Rios remained silent on this issue, Downs and Travnicek "were led to believe that they were covered by [CCIE's] auto policy." Thus, the court expressly found that Downs was ignorant of the fact that Rios disbelieved her because Rios remained silent about that and Downs would have no other means of knowing. Further, the court found that, by representing that Travnicek was to be added to the policy, Downs was led to believe Travnicek was covered; in other words, she was

ignorant of the fact that CCIE would assert that he was not covered or that CCIE would deny coverage. Again, contrary to CCIE's contentions in its objections to the statement of decision, Downs's ignorance of the true state of facts does not relate to her ignorance of the truth concealed by her alleged misrepresentations—that Travnicek was an active-duty Marine living in Oceanside. It is not Downs's alleged misrepresentations, or the truth she was concealing, that are the subject of the estoppel found by the trial court. CCIE's statements or conduct are the subject of that estoppel.

Fourth, the trial court expressly found that Downs " ' "rel[ied] upon the conduct to h[er] injury." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37.) The trial court found that, by CCIE's conduct, Downs and Travnicek were led to believe Travnicek was covered by Downs's policy with CCIE, and that, if CCIE were allowed to rescind, Travnicek would have had no coverage at the time of the accident. The court further found that Rios and Smith both knew Travnicek intended to cancel his Geico policy "thinking they were covered under the [CCIE] policy," and that if CCIE were permitted to rescind its policy, Downs would be "absolutely naked as far as exposure for [Travnicek's] tragic fatal automobile accident, as well as any rights they may have had of their own under that policy."

Finally, the trial court was clear in its ultimate determination, finding: "Any right [CCIE] had to rescind the . . . policy covering [Travnicek] and his Volvo was lost by [CCIE's] failure to exercise due diligence in determining whether Rios'[s] belief that [Downs] was lying was correct . . . . Therefore, the court finds that [CCIE] is estopped from bringing an action for Rescission and the court finds in favor of [Downs] on all causes of action brought by [CCIE]."

Contrary to CCIE's contention, we conclude that the trial court made express findings in its statement of decision relevant to the elements of equitable estoppel and the applicability of that defense here.

#### 4. Substantial Evidence Supports the Application of Equitable Estoppel

As stated *ante*, we review the trial court's factual findings under the substantial evidence standard of review. (*Thompson, supra*, 6 Cal.App.5th at p. 981.) Further, even where a court fails to make a finding on a particular matter, "if the judgment is otherwise supported, the omission is harmless error unless the evidence is sufficient to sustain a finding in favor of the complaining party which would have the effect of countervailing or destroying other findings." (*Id*. at p. 983, *Kazensky, supra*, 65 Cal.App.4th at pp. 67-68.)

Rios's testimony established that she unequivocally believed that Downs was lying to her during their conversation. However, Rios testified that she did not tell anyone. Instead, Rios wrote a policy comment to inform the next customer service representative indicating she had already determined that Travnicek was back in the household. Smith saw in the policy comments that Rios had already spoken with Downs and that Travnicek was back in the household, so CCIE could add Travnicek and his Volvo to the policy. Smith testified that, during the call, she did not ask Downs any questions about Travnicek living in the household, and that she relied solely on the policy comment prepared by Rios as establishing Travnicek's living situation. Thus, substantial evidence supported the trial court's finding that CCIE was apprised of the fact Downs misrepresented the truth about Travnicek's living arrangements. (*Honeywell, supra*, 35 Cal.4th at p. 37.)

Rios remained silent about her misgivings concerning Downs's representations, and CCIE added Travnicek and his Volvo to the policy. Thereafter, CCIE charged additional premiums for that coverage. As a result, Downs and Travnicek were led to believe that they were covered by CCIE's policy. Moreover, Rios knew Downs was exploring adding Travnicek and his Volvo to her policy to replace Travnicek's coverage with Geico. Downs told Smith that Travnicek was "currently insured but it's through a different company and I just want to put it on ours." Substantial evidence supported the

57

finding that CCIE " ' "intend[ed] that [its] conduct shall be acted upon, *or . . . so act[ed] that the party asserting the estoppel had a right to believe it was so intended*." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37, italics added.)

Rios's testimony established that she did not say anything to anyone in CCIE about her beliefs that Downs was lying to her. Substantial evidence supported the conclusion that Downs was ignorant of the fact that Rios disbelieved her because Rios remained silent about that and added Travnicek to the policy. Substantial evidence further supported the conclusion that Downs and Travnicek were led to believe Travnicek was covered, and thus were ignorant of the fact that CCIE would assert that he was not covered or would deny coverage. After all, an additional premium was charged for coverage of Travnicek's Volvo. Thus, substantial evidence supported the conclusion that Downs was " ' "ignorant of the true state of facts." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37.)

Finally, substantial evidence supported the trial court's findings that Downs relied on CCIE's silence about Rios's misgivings and CCIE's actions in adding Travnicek and his Volvo to the policy. This led Downs to believe that Travnicek was covered. Additionally, as the trial court found, both Rios and Smith knew Travnicek intended to cancel his coverage with another insurer once added to the CCIE policy. If CCIE were allowed to rescind its policy, Travnicek would have had no coverage at the time of the accident. Substantial evidence supported the trial court's finding that Downs " ' "rel[ied] upon the conduct to h[er] injury." ' " (*Honeywell, supra*, 35 Cal.4th at p. 37.) Thus, we conclude that the trial court's determination that CCIE is equitably estopped from rescinding the policy and recovering from Downs for her alleged fraudulent

misrepresentation[17] is supported by substantial evidence.[18]  Moreover, if the trial court failed to make a required finding in its statement of decision, we conclude the judgment is otherwise supported and any such omission is harmless.  (*Thompson, supra*, 6 Cal.App.5th at p. 983; *Kazensky, supra*, 65 Cal.App.4th at pp. 67-68.)

---

[17]  As Downs notes, CCIE does not advance other arguments separately addressing under a separate heading the merits of each of the causes of action for mistake, concealment, breach of duty to cooperate, reformation, and estoppel asserted against Downs.  Nor did it cite authority related to these causes of action.  (See Cal. Rules of Court, rule 8.204(a)(1)(B).)  "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority.  [Citations.]  When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration.  [Citations.]  . . . [Citations.]  We are not required to examine undeveloped claims or to supply arguments for the litigants."  (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*).)  Thus, beyond the applicability of estoppel to these causes of action, CCIE has forfeited any arguments with regard thereto.  Moreover, as we later discuss, the trial court was led to believe that "all" of the causes of action would be addressed by its ruling on rescission.  (See fn. 22, *post*)

[18]  As for the doctrine of unclean hands, we note here that, beyond a cursory reference to Civil Code section 3517 and a one-sentence quote from case law in the Introduction section of its opening brief and a citation to Civil Code section 3517 in the Introduction section of its reply brief, CCIE did not assert on appeal that Downs was precluded from asserting estoppel by the doctrine of unclean hands.  Because CCIE does not make an unclean hands argument under a separate heading or subheading supported by argument and by citation to authority, it has forfeited such an argument.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *Allen, supra*, 234 Cal.App.4th at p. 52.)  Moreover, on this record, it also does not appear that CCIE made any such argument before the trial court.  Such a claim is one that may be forfeited if not properly raised in the trial court.  (*Estates of Collins & Flowers* (2012) 205 Cal.App.4th 1238, 1256; *Marshall v. Marshall* (1965) 232 Cal.App.2d 232, 253; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 726-727.)  While there is authority for the proposition that we may consider the doctrine of unclean hands sua sponte to protect the integrity of the court in a case involving "flagrantly unconscionable misconduct" (*Behm v. Fireside Thrift Co.* (1969) 272 Cal.App.2d 15, 21, discussing *Katz v. Karlsson* (1948) 84 Cal.App.2d 469), we decline to do so here.

## G. Findings as to Cause of Action for Fraud

### 1. Elements of Fraud

"The necessary elements of fraud are: (1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) *justifiable reliance*; and (5) resulting damage." (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239, capitalization omitted, italics added.) " 'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' " (*Alliance Mortgage* at p. 1239.) " 'If the conduct of the plaintiff in the light of his own intelligence and information was manifestly unreasonable, however, he will be denied a recovery.' " (*Id.* at p. 1240.) In other words, reliance on a nondisclosure is reasonable if the plaintiff's failure to discover the concealed fact was reasonable in light of the plaintiff's knowledge and experience. (*Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 ["the issue is whether the person who claims reliance was justified in believing the representation in the light of his own knowledge and experience"].) It is not reasonable for a plaintiff to rely on misrepresentation or concealment if the facts that are within the plaintiff's observation show that it is obviously false. (See CACI No. 1908.)

### 2. Implied Findings

The express findings of the trial court regarding equitable estoppel imply that CCIE did not establish its claim for fraud, specifically that CCIE did not reasonably rely on Downs's misrepresentations.

CCIE asserts that it was not required to request a statement of decision establishing justifiable reliance because justifiable reliance is an essential element of fraudulent misrepresentation. And, according to CCIE, the trial court's "express and factually supported finding that [Downs] made a deliberate misstatement of material fact . . . was based on the satisfaction of all of the essential elements of an intentional

60

misrepresentation cause of action including actual and justified reliance." Based on this, CCIE argues it was not necessary for it to request clarification on the elements of fraudulent misrepresentation.

CCIE attempts to place the burden of specifying controverted issues and challenging the statement of decision as to the elements of its cause of action for fraud on Downs, the prevailing party. According to CCIE, if Downs "intended to challenge the court's findings of justifiable reliance, [she] should have requested a statement of decision to address the fraudulent misrepresentation issue," and because she did not, "under the doctrine of implied findings, it must be presumed that [the trial court] found that [CCIE] sufficiently proved all of the essential elements of" that claim. CCIE has it backwards. The obligation to request a statement of decision on the fraud cause of action was on CCIE. As our high court has observed, "under section 634, the party must state any objection to the statement in order *to avoid an implied finding on appeal in favor of the prevailing party*. The section declares that if omissions or ambiguities in the statement are timely brought to the trial court's attention, the appellate court will not imply findings in favor of the prevailing party. The clear implication of this provision, of course, is that *if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment*." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133-1134, italics added.) Downs was under no obligation to request a statement of decision or seek clarification to preserve inferences favorable to her.

As we have noted, CCIE listed all of its causes of action *except* the cause of action for fraud as controverted issues in its request for statement of decision. CCIE only went so far as to list: "[t]he issue of whether [Downs] deliberately misstated material facts and if so the facts she deliberately misstated." Thus, CCIE did not specify controverted issues related to elements of fraud other than the misrepresentation element.

Again, as the *Thompson* court made clear, the process required by Code of Civil Procedure sections 632 and 634 and implemented by Rule 3.1590(d)-(g) is two-fold: (1) after the court issues a tentative decision, the party must specify the controverted issues as to which it is requesting a statement of decision, and (2) after the statement of decision is issued, the party must make objections, bringing to the attention of the trial court any omissions or ambiguities. (*Thompson, supra*, 6 Cal.App.5th at pp. 982-983.) Failure to do either waives objections to the adequacy of a statement of decision. (*Id*. at p. 983.) "Because either procedural defect impedes the trial court's ability to fulfill its duty under section 632 and potentially undermines the effectiveness of any statement of decision it prepares as a tool of appellate review, *strict adherence to both steps of the process is necessary before we will reverse the presumption of correctness generally accorded trial court judgments on appeal*." *(Ibid.,* italics added.) Because CCIE failed to specify as controverted issues in its request for statement of decision anything related to the elements of fraud other than misrepresentation, it has waived its objections to those elements in the fraud cause of action, most relevant here the element of justifiable reliance.

Moreover, CCIE's later failure to list with specificity in its objections to the court's statement of decision any objections related to the other elements of fraud is further ground for our conclusion CCIE has waived its objection to the adequacy of the statement of decision on the element of justifiable reliance. (*Thompson, supra*, 6 Cal.App.5th at p. 983.) As noted, CCIE listed in its objections as item number 2: "The court should render a decision on [CCIE's] cause of action for damages for fraud, a cause of action specifically authorized by the *Barrera* court intended by the *Barrera* court to apply despite any estoppel in favor of the injured tort victim." Under the separate heading for item number 2, CCIE set forth the specifics of its request. As summarized *ante*, the specifics can fairly be characterized as a disagreement about how the trial court applied *Barrera* to its cause of action for fraud. CCIE stated: "In short, the court in

62

*Barrera* specifically held that the estoppel in favor of the injured tort victim was inapplicable to defeat the carrier[']s cause of action against the insured for misrepresentation. In [the trial court's] 'proposed' statement of decision, it directly overrules that finding:' The 'statement of decision' finds that [CCIE] is barred by the 'estoppel' in the *Barrera* decision from pursuing a fraud cause of action even though the estoppel was only meant to apply to the injured tort victim. Since the court is overruling the California Supreme Court on this issue,[19] it is submitted that this court should clearly and precisely state its legal and factual basis for finding that the 'estoppel' intended for the benefit of [] Hunter['s widow] and supported by public policy concerns of the Financial Responsibility Law should somehow be used as a weapon by [Downs] who engaged in the misrepresentations. It is submitted that the Court of Appeals [*sic*] should be provided, clearly and precisely, with this court[']s legal basis for making such a determination. It should clearly provide its reasoning on [CCIE's] claim for damages for fraud."

Thus, the record reveals that CCIE never asked the court to make findings as to the elements of its fraud claim. Indeed, in contrast to its request related to the elements of estoppel, CCIE never even set forth the elements of fraudulent misrepresentation.[20] As to the element of justifiable reliance, CCIE's objections were completely silent.

---

[19] The trial court did not "overrule" the California Supreme Court, and nothing it said in its statement of decision was inconsistent with *Barrera*.

[20] We also note the contrast between the specific objections CCIE made as to its fraud cause of action and those objections it specified as to other causes of action. Under the heading, "The court must rule on all causes of action pled by [CCIE]," CCIE discussed its causes of action for mistake, concealment, breach of duty to cooperate, reformation, and estoppel asserted against Downs. (Capitalization omitted.) CCIE specifically set forth the elements of each of these causes of action and asked the court to consider specific evidence purportedly supporting these claims. In contrast, CCIE did not set forth the elements of its fraud cause of action.

As we have noted, to avoid the doctrine of implied findings, a party's objections to a statement of decision must be "specific." (*Orange County, supra,* 12 Cal.App.5th at p. 312.) "The alleged omission or ambiguity must be identified with sufficient particularity to allow the trial court to correct the defect." (*Ibid*.) "By filing specific objections to the court's statement of decision a party pinpoints alleged deficiencies in the statement and allows the court to focus on the facts or issues the party contends were not resolved or whose resolution is ambiguous." (*Golden Eagle Ins. Co. v. Foremost Ins. Co.* (1993) 20 Cal.App.4th 1372, 1380.) CCIE did not comply with the specificity requirement as to the elements of its cause of action for fraud.

The trial court's conclusion that CCIE failed to investigate and the facts supporting that conclusion also establish that CCIE did not justifiably rely on Downs's misrepresentations. A "plaintiff who is aware of circumstances indicating that the defendant's representations *may be* false has a duty to investigate the truth of the facts represented." (5 Witkin, Summary of Cal. Law (11th ed. 2019) Torts, § 935, italics added.) Here, not only was CCIE aware of circumstances indicating Downs's representations *may be* false, but Rios, CCIE's agent, concluded that statements Downs made were actually false. Nor could CCIE justifiably rely on Downs's statements because Rios believed one of the two statements Downs made about Travnicek's living arrangements was true. It simply was not reasonable for CCIE to rely on either statement regarding the material fact of residency which qualified Travnicek for coverage when Rios believed at least one of the statements to be false and did not know which of the statements was true. Downs's lie about the residency issue should have raised a red flag warranting additional inquiry or investigation. CCIE could not justifiably rely on Downs's statements.

In a perplexing argument, CCIE contends in its reply brief that under the doctrine of implied findings, it must be presumed that the trial judge found that CCIE sufficiently proved all the elements of fraudulent misrepresentation, including justifiable reliance.

CCIE argues that because the trial court made a finding that Downs made deliberate and material misrepresentations, CCIE is not required to request findings on the essential elements of its fraudulent misrepresentation claim. CCIE further argues that "a finding that [CCIE] did not justifiably rely on [Downs's] deliberate misrepresentations is in direct opposition to the trial court's determination of [Downs's] fraudulent misrepresentation."

But the trial court's finding that Downs made material misrepresentations did not equate to a finding that CCIE proved its claim for fraud because an essential element of that claim is justifiable reliance. Indeed, as we have discussed *ante*, the court's findings imply that CCIE could *not* have justifiably relied on Downs's misrepresentations because Rios believed Downs was not being truthful. To establish justifiable reliance, the plaintiff must prove that it believed the defendant's representations to be true. (*Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1168 [" ' " 'plaintiff must plead that he believed the representations to be true . . . and that in reliance thereon (or induced thereby) he entered into the transaction.' " ' "].)

\* \* \* \* \*

65

The evidence supported a finding that CCIE did not justifiably rely on Downs's misrepresentations and, consequently, CCIE failed to establish the claim for fraud.[21]

---

[21] CCIE also complained in its appellate briefing that: "although [the trial court] bifurcated only the rescission cause of action, the [court] dismissed the balance of [CCIE's] causes of action on the basis that the failure of the rescission eliminated all of the damages claims" and "did not explain why [CCIE] was not entitled to a jury on the misrepresentation and fraud causes of action." This contention was stated without reference to citations in the record or supporting legal argument. Again, we are not required to examine undeveloped claims or to supply arguments for the litigants. (*Allen, supra*, 234 Cal.App.4th at p. 52.) In any event, our reading of the record reveals that counsel for CCIE led the trial court to believe there would be no need for a jury trial if the recission issue was bifurcated. CCIE's complaint asserted the policy was void and rescinded, or requested an order of rescission, based on fraud and misrepresentation. (See fn. 4, *ante*.) During the hearing on the pretrial motions, counsel for CCIE discussed CCIE's request for a bench trial. Counsel for Downs objected initially to the late jury trial waiver, arguing, "while there is a discussion of rescission, really what's going on in this case is [CCIE] paid out $500,000 . . . CCIE is trying to get that money back from [Downs], and that's what's going on with the case, a money issue." After discussion about why the jury trial waiver had not been made earlier, counsel for CCIE told the trial court that when he had been previously asked by a different judge at trial setting whether he was requesting a jury or non-jury trial, "I said . . . non-jury trial, Your Honor." When counsel for Downs stated that witnesses would have to testify twice, counsel for CCIE stated that rescission is "a central issue throughout *all* the causes of action." (Italics added.) He went on to say, "all of the witnesses that I'm aware of would be on this issue of rescission. . . . So I don't know of any witnesses that would be duplicative" When counsel for Downs complained he would have to put on their witnesses in a second proceeding, counsel for CCIE said, "I don't know what the second trial he's referring to is." It was shortly thereafter that the trial court stated that it agreed that "rescission is the focal point" of CCIE's complaint. After the pretrial motion hearing, the court stated in a written ruling that "[CCIE's] causes of action are based upon rescission, and those causes of action will be heard first in a non-jury trial. The remaining causes of action in [Downs's] cross-complaint will be heard subsequent to the trial on the rescission issues." No objection was made to this ruling. As we have noted, in the trial court's tentative decision, it ruled in favor of Downs on "all" of CCIE's causes of action. CCIE did not list that ruling as a controverted issue in its request for statement of decision. And after the trial court made the same ruling in its statement of decision, CCIE did not register an objection specific to that part of the trial court's ruling. We reject CCIE's belated complaint on appeal that the trial court did not explain why it was not entitled to a jury on its fraud cause of action.

## DISPOSITION

The judgment is affirmed.  Downs shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


_____/s/_____
MURRAY, J.

We concur:


_____/s/_____
RAYE, P. J.


_____/s/_____
BUTZ, J.*

---

\* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.